WILLIAM M. RODGERS and DILLER LUTHER, Respondents, *v.* LEWIS PHILLIPS and FREDERICK C. OAKLEY, Appellants.

Upon a verbal contract of sale of goods of more than fifty dollars in value, a delivery of them, in accordance with such contract, to a general carrier, not designated or selected by the buyer, does not constitute such a delivery *and acceptance*, under the statute of frauds, as to pass the title to the goods.

Although, in the case of a contract itself valid, such delivery is sufficient to transfer the title and risk to the purchaser, yet it is not such a consummation of the sale as gives validity to a contract otherwise void under the statute.

Accordingly, where the defendants, residing at New York, gave to the plaintiffs a verbal order for 188 tons of coal, and directed that it be delivered, for transportation to them, "on board at R.," in the customary manner, and the plaintiffs thereupon shipped the coal upon a barge, at R., and received a bill of lading therefor from the master, by which the coal was made deliverable to the defendants at New York, they paying freight, and forwarded the bill of lading to the latter; and the barge, a few hours after the coal was placed on board of her, and before starting on her voyage, sprang a leak, and was sunk, with her cargo—*Held*, in an action brought by the plaintiffs to recover the price from the defendants, that the title had not passed, and the action could not be maintained.

Even a delivery to a carrier specially designated by the purchaser, where such carrier has no other authority than to transport the goods, does not satisfy the statute. WOODRUFF, MASON and JAMES, JJ. (HUNT, Ch. J., and GROVER, J., *contra.*)

*It seems* that, ordinarily, in the absence of any fraud or mistake, an acceptance by the purchaser of a bill of lading of the goods is equivalent to an acceptance of the property mentioned in it. DANIELS, J.

(Submitted April 3d, 1869, and decided June 14th, 1869.)

THIS action was brought to recover the purchase price of 188 tons of coal, amounting to the sum of $651.30. The coal was contracted to be sold by the plaintiffs to the defendants by an oral agreement, entered into prior to the 26th day of June, 1858. By the terms of this agreement, it was to be shipped on board a boat at Richmond, in the State of Pennsylvania, for the defendants, and to be carried from there to Twenty-eighth street, on the East river, in the city of New

York; the defendants paying the freight for the same. The coal was shipped by the plaintiffs on board the coal boat, I. K. Smith, at Richmond, for the defendants, on Saturday, the 26th day of June, 1858; and a bill of lading taken from the master, by which the coal was to be delivered at Twenty-eighth street, on the East river side of the city of New York, to the defendants, upon the payment of the freight by them. During the afternoon of the day when the coal was laden upon the boat, she commenced leaking, and finally sank on the morning of the following day. The boat and cargo remained in the water, where they sank, until they were finally removed by the public authorities as obstructions to navigation. On Monday, the 28th of June, 1858, the plaintiffs, who kept their office at the city of New York, received the bill of lading by mail; and on the same day they sent it with an invoice of the coal to the defendants' office. The invoice consisted of an unsubscribed bill of the coal. On Tuesday, the 29th, the defendant, Oakley, together with Mr. Harriott, the secretary of the Brevoort Insurance Company, called at the plaintiff's office, and inquired of Mr. Rogers, one of the plaintiffs, concerning the condition of the boat; how she had sunk, the cost of raising her, and what he could do it for. He answered that he could give no information in regard to the matter. Another witness, Hubbard, who was present at the same interview, stated that he understood from the conversation, that Harriott was to go to Philadelphia to see about raising the vessel. The next day but one succeeding this interview, which was the 1st day of July, the defendants sent back the bill of lading to the plaintiffs; and they returned it to the defendants the same day in a letter, saying that they had nothing to do with it. Upon this evidence, the defendants moved for a nonsuit, on the ground that no valid sale was established under the statute of frauds. The motion was denied, and the defendants excepted. In addition to proving the condition of the boat at the time the coal was placed on board of her, and the manner of her sinking, the defendants proved by the defendant, Oakley, that he

was a director in the Brevoort Insurance Company, and that, on the receipt of the bill of lading, he went to the office of that company and tried to effect an insurance on the coal. The insurance was refused on the ground that the boat was rated on the company's books as twelve years old, and notoriously rotten. After hearing of the sinking of the boat, Harriott, who went to the plaintiff's office with the defendant, Oakley, on Tuesday, went to Philadelphia and attended to the matter. What he did, beyond inquiring into the condition of the boat, was not made to appear. The proofs were thereupon closed; and the court refused to allow the defendants' counsel to go to the jury on the questions of fact involved in the case, on the ground that the defendants had failed to make out any defence to the action, and directed a verdict for the plaintiffs. The defendants excepted to the decision and direction of the court. Upon the hearing of the exceptions, at the General Term, judgment was directed for the plaintiffs; and when that was entered the defendants appealed to this court.

*William H. Scott*, for the appellants, insisted that, while at common law, a delivery to the proper carrier is constructively a delivery to the vendee, to constitute a valid sale under the statute of frauds, in the absence of a writing, there must be not only a delivery to the vendee, but an *unconditional acceptance* by him; and he cited, on this point, Addison on Contr. 2d Am. ed., 244, and cases there cited; id., 257; *Shindler* v. *Houston* (1 Comst., 269); Story on Contr., § 821; 2 Kent, p. 545; *Stubbs* v. *Lund* (7 Mass., 457); *White, head* v. *Anderson* (9 M. & W., 534); *Van Castel* v. *Booker* (2 Exch., 709); *Farina* v. *Home* (16 M. & W., 119, 123); Lord CAMPBELL, Ch. J., in *Hart* v. *Bush* (4 Jur. N. S. Q. B., 271); *Mabberly* v. *Sheppard* (10 Bing., 99); *Lilywhite* v. *Devereaux* (15 M. & W., 385); *Dilke* v. *Andrews* (2 Exch., 290); The reception merely of the bill of lading is not such acceptance, *Meredith* v. *Weigh* (2 El. & Bl., 364); *Farina* v. *Howe, supra;* *Norman* v. *Philips* (14 id., 277). Even at common law, the

delivery being on board of an utterly unseaworthy vessel, the plaintiffs were responsible for the neglect. (Jones' Bailments, 10, 119; 2 Ld. Raym., 909; Story on Bailments, § 23; Pothier's Obligations; Observations Generales.)

*J. R. Whiting*, for the respondent, upon the point that a delivery to a carrier or master of a vessel, when goods are to be transported by water, passes the property, cited *People* v. *Haynes* (14 Wend., 562); *Hayne* v. *Porter* (3 Hill, 141); *Waldron* v. *Romaine* (22 N. Y., 368); *Wiseman* v. *Vandeputt* (2 Vern., 203); *Dutton* v. *Solomonson* (3 Bos. & Pull., 582); *Dawes* v. *Peck* (8 Term R., 330); *Coxe* v. *Harden* (4 East., 211); *King* v. *Meredith* (2 Camp., 639); *Godfrey* v. *Furzo* (3 P. Wm's., 185); *Bull* v. *Prescott* (1 Atk., 248); *Hart* v. *Satterly* (3 Campb., 528); *Griffith* v. *Ingledew* (6 Serg. & R., 429); *Ludlow* v. *Brown* (1 Johns. R., 15; 2 Kent, 449). That a bill of lading, accepted, passes the title, he cited, *Griffith* v. *Ingledew* (*supra*).

DANIELS, J. A large portion of the evidence, contained in the case, was given upon the trial for the purpose of showing that the plaintiffs had negligently misconducted themselves in lading the coal upon an unsafe and unseaworthy vessel; and that in consequence of that misconduct the coal had been lost. This defence was properly rejected by the court, for the reason that it had not been set forth in the answer.

The disposition which should now be made of the controversy will, therefore, depend entirely upon the sufficiency of the evidence given upon the trial to establish the fact, that the coal had been delivered to and accepted by the defendants. The contract for the sale of it was within the statute of frauds; and on that account, as it was not in writing, and nothing had been paid upon it, by the direct terms of that statute it was void. Although the plaintiffs did perform all that would have been requisite to transfer the title to the coal to the purchasers, under the well established rule of the common law, it does not follow that what they did would be attended with the same result under the rule pre-

scribed by the statute. Where a valid and subsisting con-
tract for the sale of personal property may be shown to
exist, and by its terms the property is to be shipped by the
vendor to the vendee, then a delivery of it to a responsible
carrier for the vendee, to be carried and delivered to him,
will, ordinarily, transfer the title to the vendee and place the
property at his risk. But this rule requires that the contract
between the parties shall be at the time legal, valid and sub-
sisting. It does not include cases like the present one,
where, on account of a failure to comply with the positive
rule prescribed by the statute, the contract is void, and must
remain so until some act has been performed that will have
the effect of giving it legal validity. In cases like the present
one, it is the statute, and not the common law, that has pro-
vided the mode by which the previously void agreement
could be rendered legal and binding upon the parties. And
that mode must be pursued; otherwise, the agreement must
remain without any binding force upon either of the parties.
Until that may be done, the contract must remain entirely
optional on the part of each of the parties. Even if the ven-
dors elected to perform it, and deliver the property precisely
as they had agreed to, it was still optional with the vendees
whether they would receive it or not. And even if the for
mer went so far as to actually deliver it, the vendees still had
their election to either receive or refuse it.

This resulted from the unequivocal terms made use of in
the statute. They required that the vendees under such a
contract as was shown upon the trial of this cause, should not
only receive, but, in addition to that, accept part of the pro-
perty contracted to be sold to them, in order to render the
contract binding upon them in law. Where the contract, or
a note or memorandum of it has not been reduced to writing
and subscribed by the parties to be charged by it, and no part
of the purchase price has been paid, then the statute declares
it to be void where the price amounts to the sum of fifty
dollars or upwards, unless "the buyer shall accept and
receive part of such goods." (3 R. S., 5th ed., 222, sub. 2 of

§. 3.) This statute is in substance the same as the previously existing English statute, and they have both been regarded as identical in the change they have produced in the common law rule.

By the construction they have received, and which their language manifestly required, a mere delivery, of the property contracted to be sold by the terms of the void contract, has been held to be insufficient to vest the title to it in, or place it at the risk of the vendee. But, beyond that, it became necessary, under the rule adopted by the statute that some part of the property should not only be delivered and received by the vendee, but that it should also be accepted by him. This acceptance of it involved something more than the act of the vendor in the delivery. It required that the vendee should also act, and that his act should be of such a nature as to indicate that he received and accepted the goods delivered as his property. He must receive and retain the articles delivered, intending thereby to assume the title to them to constitute the acceptance mentioned in the statute; when that has been done, then, for the first time, the void contract becomes valid and obligatory upon the parties to it.

This rule of construction was adopted at an early day by the English courts. (*Tempest* v. *Fitzgerald*, 3 Barn. & Ald., 680; 5 E. C. L., 419; *Carter* v. *Toussaint*, 5 Barn. & Ald., 855; *Baldey* v. *Parker*, 2 Barn. & C., 37; 9 E. C. L., 16, 17.) And since then it has been approved and applied by this court to the statute existing upon this subject in this State. (*Shindler* v. *Houston*, 1 Comst., 361.) In the decision of that case Judge GARDNER stated the English rule as requiring that "there must be a delivery by the vendor, with an intention of vesting the right of possession in the vendee, and there must be an actual acceptance by the latter with the intent of taking possession as owner." He then adds: "This, I apprehend, is the correct rule, and it is obvious that it can only be satisfied by something done subsequent to the sale unequivocally indicating the mutual intentions of the parties." (Id., 265.) Judge WRIGHT said "that the acts of the

parties must be of such a character as to unequivocally place the property within the power, and under the exclusive dominion, of the buyer." Where the acts of the buyer are equivocal, and do not lead irresistibly to the conclusion that there has been a transfer and acceptance of the possession, the cases qualify the inference to be drawn from them, and hold the contract to be within the statute. (Id., 210, 211.) And to this effect is the case of *Dewey* v. *Williams* (5 Allen, 1). This, it will be perceived, is very decided language, but no more so, certainly, than was used in the enactment of the statute to which it was applied. And it was afterwards followed and again applied in deciding the case of *Brabin* v. *Hyde* (32 N. Y., 519).

The question in this case, therefore, is whether such an acceptance of the coal by the defendants was shown as placed it at their risk at the time when it was lost by the sinking of the vessel it was laden upon. And, for the purpose of considering and deciding it, this case must be distinguished from those where the property contracted to be sold was delivered to a particular carrier designated and selected by the vendee for the purpose of receiving and accepting it. For, in those cases, the carrier by the act of the vendee became his agent, and bound him by the receipt and acceptance of the property. (*Dawes* v. *Peck*, 8 Term., 330; *Waldron* v. *Romaine*, 22 N. Y., 368; *Bushell* v. *Wheeler*, 15 Ad. & Ellis' N. S., 442.) This case differs from those in the circumstance that no such designation or selection was made by the defendants. The carrier to whom the property was delivered, to be carried to the defendants, was selected by the plaintiffs. The defendants in no manner authorized or participated in it, beyond the void authority conferred by the terms of their void contract. Being void, as it was, the plaintiffs could not avail themselves of its terms, for the purpose of binding or concluding the defendants by what they did under it. Whatever they did towards the performance of the contract they did for themselves, and at their own risk, until the defendants elected to change the risk, and

did change it, by the acceptance of the property mentioned in the statute; what the evidence showed was a selection of the carrier by the plaintiffs, and a delivering of the coal to him, not an acceptance of it by the defendants. That acceptance required some act on the part of the vendees, to constitute it, performed after the coal had been separated from the mass and placed in such a condition as rendered that particular quantity capable of being accepted by the defendants. The evidence not only failed to show the performance of any act of acceptance on the part of the defendants, but beyond that, it appeared that they did not hear of its shipment until the vessel it was laden upon had sunk to the bottom of the Schuylkill. There was nothing, therefore, in the case from which the defendants could be deemed to have accepted the coal at that time. It consequently continued to be the plaintiffs' property, remaining at their risk, and it was their loss when the vessel sunk, after it had been laden on board of her. And if the carrier became liable for the loss, his liability was to the plaintiffs, not to the defendants. That a mere delivery of property to a carrier selected to receive and carry it by the vendors, will, in no legal sense, constitute an acceptance of it by the vendee, and for that reason, exclude the case from the operation of the statute, has been distinctly held in several adjudged and well considered decisions. This point was directly presented in the case of *Maxwell* v. *Brown* (39 Maine, 98); and after an examination and reference to the English authorities, the court held that the delivery to the carrier was insufficient to show an acceptance by the vendee. The same point arose, under slightly different circumstances, in the case of *Frostburg Manuf. Co.* v. *New Eng. Glass Co.* (9 Cush., 115); and it was disposed of in the same way. And a delivery to a carrier selected by the vendor for the transportation of the property, where that was done in conformity to the terms of the void contract, was held to be in no sense an acceptance by the vendee, in the cases of *Hanson* v. *Armitage* (7 Eng. C. L., 191); *Acebal* v. *Levey* (25 id., 170); *Meredith* v. *Weigh*

(75 id., 363); *Coats* v. *Chaplin* (43 id., 831); *Norman* v. *Phillips* (14 Mees. & Wels., 278); *Farina* v. *Home* (16 id., 119); *Coombs* v. *Bristol, &c. Railway Co.* (3 Hurl. & Nor., 510); *Hart* v. *Bush* (1 Ellis B., & Ellis, 494); and the cases of *Howe* v. *Palmer* (5 Eng. C. L., 303); *Bentall* v. *Brewer* (10 id., 138); *Hunt* v. *Hecht* (20 Eng. Law and Eq., 524); *Holmes* v. *Haskins* (28 id., 564); and *Castle* v. *Sworder* (5 Hurl. & Nor., 281), though differing in their circumstances, are in substance, to the same effect.

Up to the time when the coal was lost by the sinking of the vessel having it on board, no act was performed by the defendants, from which it could be even colorably claimed that they had accepted the coal or become invested with the title to it. For it was not until the day afterwards that the invoice and bill of lading were delivered to them; and then the rights of the parties had become fixed by the loss of the property. The loss was then that of the plaintiffs, and nothing afterwards transpired warranting the conclusion that the defendants intended to shift it and impose it upon themselves.

Assuming, as it may properly be done, that the acceptance of the bill of lading by the defendants, under ordinary circumstances, would have been equivalent to the acceptance of the property mentioned in it, yet that could not be the effect of it where, as in this case, the property had been previously lost. Certainly not; unless the acceptance was made with knowledge of the circumstances affecting the propriety of it existing at the time it occurred.

But even if it could have produced that result, something more would have to be shown, for the purpose of establishing the acceptance than was done upon the trial of this action. What transpired when the bill of lading was left at the defendants' office, was not made to appear. All that was shown upon the subject of an acceptance of it, was that one of the defendants, after its receipt, applied for an insurance upon the coal, and failed to procure it on account of the unseaworthy character of the vessel upon which the plaintiff had placed it. This was clearly insufficient for that purpose

because it did not show that the defendants had dealt with the property as their own, but merely that they had attempted to do so and failed. What they did in this respect was done before they had received any intelligence of the misfortune to the property. And even if, prior to that time, they had determined to accept the shipment by accepting the bill of lading, upon the supposition and belief that the property was then afloat, they became at liberty to rescind their determination and refuse to receive it, as soon as they discovered that it had been found under a mistake of a material fact affecting it. When that fact was discovered, an interview took place between one of the defendants and one of the plaintiffs, but nothing was settled by what then occurred. After that Mr. Harriott was sent to Philadelphia by the defendants, and he testified that he attended to the matter. But what he did beyond inquiring into the condition of the boat, was neither stated by himself nor by any other witness. Neither of these circumstances, nor all of them combined, so far tended to prove an acceptance of the property as to justify the court in leaving that fact to the consideration and decision of the jury. When the additional circumstance is borne in mind, that on Thursday of the same week, the defendants sent back the bill of lading to the plaintiffs, it will be perceived that there was absolutely nothing from which an acceptance of the property shipped could be even plausibly maintained.

At the time the bill of lading was delivered to them, they had a reasonable time after ascertaining the circumstances in which to determine whether they would accept or reject it, the same as they would have had upon an actual delivery of the property itself, for which the bill was merely a substitute. Within that time they rejected and returned it to the plaintiffs, which plainly left the transaction invalid as a sale, under the direct prohibition of the statute. In this respect the case had no more foundation for its support than *Norman* v. *Phillip, Farina* v. *Home*, and *Coats* v. *Chapin, supra,* and *Bill* v. *Bament* (9 Mees. & W., 35) had, in which it was held

that no acceptance of the property by the buyer could be inferred.

The court at the trial erred in refusing to nonsuit the plaintiffs and in directing a verdict against the defendants. The judgment should be reversed and a new trial ordered.

WOODRUFF, J. The question in this case, the decision of which is conclusive between the parties, is whether a delivery of goods to a general carrier, in pursuance of the order of a proposed purchaser, to be transported to him, is such a consummation of the contract of sale as dispenses with a writing and takes the transaction out of the operation of the statute of frauds.

The defendants, in New York, gave verbal orders for 175 to 200 tons coal, and directed that it be delivered " on board at Richmond (near Philadelphia), in the customary manner," no particular boat or barge being designated.

The plaintiff shipped 188 tons, lading it upon the coal barge " I. K. Smith," received a bill of lading therefor, whereby the coal was made deliverable to the defendants, they paying freight, and forwarded the bill of lading to the defendants. Within a few hours after the coal was placed on board, and before leaving on her voyage, the barge sprung a leak and was sunk with the coal on board.

The defendants received the bill of lading on Monday, June 28, 1868; on receiving information of the sinking of the barge, the defendants sent an agent to Richmond to learn the facts, and on Thursday returned the bill of lading, denying their liability to pay for the coal.

In accordance with the general rule, that where goods are purchased, to be shipped or sent to the buyer, a delivery to the carrier, whether he be a general carrier or one specially designated by the buyer, constitutes performance by the seller, is a sufficient delivery, vests the title to the goods in the buyer (subject to the right of stoppage in transitu), and places the goods at his risk, the Supreme Court held the plaintiffs entitled to recover.

HAND — VOL. I. 67

This general rule is unquestionable; and the numerous cases cited by the counsel for the respondent, on the argument of this appeal, are full and conclusive. It is quite sufficient to mention *Ludlow* v. *Brown et al.* (1 John's R., 15); *The People* v. *Hayne* (14 Wend., 562); *Hayne et al.* v. *Porter* (3 Hill, 141); *Waldron* v. *Romaine* (22 N. Y., 368); *Dawes* v. *Peck* (8 T. R., 330); *Dutton* v. *Solomonson* (3 Bos. & Pul., 584); and cases incidentally considered in *Harris* v. *Hart* (6 Duer, 606); and *Holbrook et al.* v. *Vose et al.* (6 Bosw., 104).

But the decision below overlooks the fact, that the statute of frauds requires the acceptance and receipt of the goods as well as delivery; and without these, there is no binding contract of sale.

In the cases referred to, and in the text books, where the question is, what constitutes performance by the vendor, or delivery, so as to vest title and place the goods at the risk of the buyer, an existing, binding agreement or purchase is assumed. Here the inquiry is, whether there is a binding contract. A parol agreement of purchase, the statute declares void, "unless the buyer shall accept and receive part of such goods," &c. (2 R. S., p. 135, § 3, subd. 2.)

The rule on this subject, stated by Story, in his treatise on Sales as established by the authorities, is this: "The meaning to be attached to the terms 'accept and receive,' is that the purchaser must finally appropriate to himself the whole, or a part of the goods. To create such an appropriation as that contemplated in the statute, there must be not only such an actual delivery by the seller as to destroy all further claim of lien or of stoppage *in transitu* on his part, but also such an actual acceptance by the buyer, as to disable him from objecting to the *quantity* or quality of the goods. * * The delivery must be a complete and final delivery, and the acceptance an ultimate acceptance; so as to reduce the goods to the actual possession of the vendee. It follows, therefore, that no receipt of goods by a carrier or middleman, on their way to the buyer, is a sufficient acceptance, unless such carrier or middleman be the general agent of the vendee, having

authority finally to accept them." This broad and explicit exposition of the acceptance necessary to give validity to the contract, and stand in place of a writing, is founded upon numerous English cases on the construction of the statute in England, from which ours is copied. (*Baldey* v. *Parker* 2 Barn. & Cres., 44; *Phillips* v. *Bistoli*, id., 513; *Smith* v. *Surman*, 9 Barn. & Cres., 561; *Carter* v. *Touissant*, 5 Barn. & Ald., 858; *Kent* v. *Huskisson*, 3 B. & P., 233; *Hanson* v. *Armitage*, 5 Barn. & Ald., 557; *Astley* v. *Emory*, 4 Maule & Selw., 264; *Howe* v. *Palmer*, 3 B. & A., 321; *Johnson* v. *Dodgson*, 2 Mees. & Welsb, 656.)

Obviously this rule is decisive of the question in this case. Indeed, it is wholly unnecessary to go to so great length for the purposes of this case.

Addison, in his treatise on contracts, though not in terms, yet in substance, gives the like exposition of the force and effect of these terms of the statute, superadded to the force of mere delivery, where there is already a valid contract of sale. (Add. on Cont., pp. 243, 244, 245.)

It has sometimes been argued that delivery to a carrier designated by the buyer will suffice to satisfy the statute, although delivery to a general carrier will not; but this distinction cannot be sustained where the carrier has no other authority than to transport the goods. In *Acabel* v. *Levy* (10 Bing, 376), the delivery was on board a ship chartered by the buyer, and yet it was not held to constitute an acceptance within the statute; and see, also, *Meredith* v. *Meigh et al.* (2 Ellis & Bl., 364).

In *Shindler* v. *Houston* (1 Comst., p. 273), WRIGHT, J., reviews the cases on the construction of these terms in the statute, and says: " The best considered cases hold that there must be a vesting of the possession of the goods in the vendee as absolute owner, discharged of all lien for the price on the part of the vendor, and an ultimate acceptance and receiving of the property by the vendee, so unequivocal that he shall have precluded himself from taking any objection to the quantum or quality of the goods sold." (Chitty on Contracts, 390, and cases cited; Hilliard on Sales, 135, and cases cited.)

The proposition thus stated is in unquestionable conformity to the English cases above referred to, but the Court of King's Bench, in England, in *Morton* v. *Tibbett*, in 1850 (15 Ad. & El., N. S., 428), while they recognize the necessity of an acceptance to satisfy the statute, deny that an acceptance which will satisfy the statute necessarily precludes the rejection of the goods after examination, and denying the fact of performance by the vendor.

Lord Campbell reviews the previous cases, and, while he admits the repeated assertion of the rule as above stated, he questions its soundness, and finds, in other cases, some warrant for his qualification of the rule.

But the rule that there must be something more than such a delivery as would change the title, and place the goods at the risk of the buyer, if the contract was in writing, is not questioned. It is sufficient, for the purposes of this case, to say that a delivery to a general carrier not designated by the buyer, for the mere purpose of transportation to him, does not constitute an acceptance of the goods within the statute of frauds.

In *Coombs* v. *Bristol and Exeter Railway Co.* (3 'Hurl. & Norm., 510), in 1858, the subject was considered, at length, in the English Court of Exchequer, and the rule reasserted. See, also, on the meaning of the term "receive," *Fernier* v. *Home* (16 Mees. & Welsb, 119); *Hart* v. *Bush* (4 Jur., N. S., Q. B., 271); *Frostburg Mining Co.* v. *New Eng. Glass Co.* (9 Cush., 115).

The judgment is clearly erroneous. The defendants never accepted nor received the goods, within the meaning of the statute, and the defendants' motion for a nonsuit should have been granted.

The judgment must be reversed.

Mason and James, JJ., concurred in Woodruff's opinion.

Grover, J., was for reversal. He was not, however, prepared to concur in the doctrine of Woodruff's opinion as to the case of a carrier designated by the vendee.)

HUNT, Ch. J., concurred with GROVER, J. He, also, was inclined to think that the fact of the property being put by the plaintiffs on board an unseaworthy vessel was a material circumstance in favor of the defendants.

LOTT, J., *dubitante*, did not vote.

Judgment reversed and new trial ordered.