Buggeln, "and it shall not be divulged by him so long as Madam Marie continues in the employ of the Institute." Whether or not it could be divulged by him after April 30, 1908, is not stated, and is not clear; nor is it necessary now to decide. It was not expressly provided that she should deposit a copy of the formula with him; but she did so. He must be regarded as having accepted it upon a tacit agreement to act as a repository thereof, and to keep it secret for at least a year. This agreement he broke, according to testimony which must, upon the present motion, be assumed to be true. He told the secret to employés of the Institute, who used it at cut rates upon patients who could not afford to pay plaintiff's prices.

While the subject is somewhat obscure, I think that the action is sustainable against Buggeln as one in trespass on the case; his breach of duty being tortious in nature. "So, if a man, being intrusted in his profession, deceive him who intrusted him, as if a man retained of counsel * * * discover the evidence or secrets of the cause," the action will lie. Comyn's Digest, "Action upon the Case for a Deceipt," A, 5. The complaint, indeed, does not contain any words characteristic of an action in tort; but this objection, if tenable at all, must be regarded as having been waived by not taking it at the trial. Collins v. Butler, 179 N. Y. 156, 162, 71 N. E. 746. As against the Institute the sustainability of an action in tort is more doubtful, but the question does not arise upon this motion.

The only evidence tending to prove damage is that above referred to. No attempt was made to show how much money the Institute took in by its illegitimate use of plaintiff's formula. One witness testified that she was promised a cure for $50, because she could not pay plaintiff's price of $150, and that she was treated twice; but not even she was asked if she paid. It was to the interest of the Institute to have the treatment given by plaintiff, since at her price its share of the fee would be $120, instead of $50, while she would do all the work. She was discharged in December, 1907; but no evidence is offered as to whether her formula was used after that. Under the circumstances there was no basis for any verdict for a substantial amount. There might be, however, upon another trial. Hence the error as to the individual defendant cannot be disregarded. Thomson-Houston Co. v. Durant Co., 144 N. Y. 34, 49, 39 N. E. 7.

The motion for a new trial is therefore granted as to defendant Buggeln, but denied as to the other defendant.

---

(66 Misc. Rep. 9.)

### SHULTZ et al. v. SKANEATELES R. CO.

(Supreme Court, Special Term, Onondaga County. January, 1910.)

1. CARRIERS (§ 184*)—CARRIAGE OF GOODS—LOSS OF FREIGHT.

   In an action against a carrier for damage to goods on the line of a connecting carrier, complaint, alleging that defendant undertook to deliver the goods in another state beyond its lines, to which complaint the bill of lading exempting the initial carrier from damage beyond its own lines is attached, and which only contracts to deliver to the connecting carrier,

---

fails to state a cause of action except as it may be saved by Act Cong. June 29, 1906, c. 3591, § 7, 34 Stat. 595 (U. S. Comp. St. Supp. 1909, p. 1166), imposing on initial carrier liability for damage by connecting carriers notwithstanding contracts to the contrary.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 184.*]

2. CARRIERS (§ 177*)—CONNECTING CARRIERS—LIABILITY FOR LOSS OF FREIGHT.

Act Cong. June 29, 1906, c. 3591, § 7, 34 Stat. 595 (U. S. Comp. St. Supp. 1909, p. 1166), imposing on initial carrier liability for damage by connecting carriers, applies to every carrier receiving property for transportation to a point in another state, though its own line may lie wholly within the state of the place of shipment.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 177.*]

Action by John L. Shultz and another against the Skaneateles Railroad Company. Demurrer to complaint overruled.

C. R. Milford, for plaintiffs.
Costello, Burden, Cooney & Walters, for defendant.

ROGERS, J. The plaintiffs bring suit to recover for the loss of certain cabbages shipped over the defendant's road and connecting lines, destined to Roanoke, in the state of Virginia. The defendant's station at which shipment was made is Skaneateles, Onondaga county, N. Y.; and its road extends from that village to Skaneateles Junction in the same county, where connection is made with the New York Central & Hudson River Railroad.

The complaint alleges that defendant is a common carrier; that in March, 1907, it received from the plaintiffs, for transportation from Skaneateles to Roanoke in the state of Virginia, one car load of prime Danish cabbages of first quality, in the best marketable condition, to the amount in value of $265.59; that the cabbages were loaded by the plaintiffs on that day in a careful and proper manner and in a car which was specially prepared and fitted for such transportation; and that the defendant, on receipt of the cabbages, issued a bill of lading to the plaintiffs, which, among other things, contained the following clauses:

"Received * * * the property described below (cabbages) in apparent good order except as noted (contents and condition of contents of packages unknown) marked, consigned and destined as indicated below, which said company agrees to carry to said destination, if on its road, otherwise to deliver to another carrier on the route to said destination. * * *

"No carrier shall be liable for loss or damage not occurring on its roads, or its portion of the through route, nor after said property is ready for delivery to the next carrier or to consignee."

The complaint also alleges that said car load of cabbages was accepted and received by the defendant for transportation for hire under and with the understanding and agreement, and defendant covenanted and agreed to and with the plaintiffs and undertook to transport and cause to be transported for hire the said car load of cabbages, without delay and without loss, neglect, or damage, and to deliver the said car load of cabbages in good condition, without loss, injury, damage, or delay, to A. G. Chewing, at the city of Roanoke in the state of Virginia, and that the defendant neglected to perform said contract, in that said

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cabbages were transferred to another car than that in which they were loaded, without the plaintiffs' knowledge. or consent, and which car was not properly prepared for the transportation of said cabbages and was unsuitable for such purpose, and carelessly and negligently handled and loaded the same into said second car, and that by so doing the cabbages were spoiled, so that when they arrived at Roanoke they were of no value whatever; that, in consequence of such spoiling, the plaintiffs sustained a loss to the amount of $265.59. It is also alleged that the said condition was caused by said "defendant's agents, servants, officers, employés, and connecting carriers."

To this complaint the defendant demurs on the grounds: (1) That it does not state facts sufficient to constitute a cause of action; (2) that there is a defect of parties defendant, in that connecting carriers were involved in the contract; and (3) that this court is without jurisdiction.

In disposing of this demurrer, the matters alleged in the complaint must be assumed to be true, which, of course, include the statement that the defendant undertook to transport the cabbages from Skaneateles to Roanoke, Va. Carriage over its own and divers connecting lines would be required to make delivery to the consignee. On the other hand, as has already been noted, the bill of lading, which is attached to and made a part of the complaint, exempts the initial carrier from loss or damage, occurring without its fault, on a connecting line, and only contracts to deliver to said connecting line.

At common law, as I understand, the carrier discharges its obligation by delivery in good condition to the connecting carrier (Sherman v. Hudson R. R. Co., 64 N. Y. 254; Pratt v. Grand Trunk R. R. Co., 95 U. S. 43, 24 L. Ed. 336); but it may by contract bind itself to deliver safely to a destination beyond its own line (Root v. Great Western R. Co., 45 N. Y. 524). Naming a destination, however, does not raise a presumption of an agreement to carry safely over the connecting line: Babcock v. Lake Shore & Michigan Southern R. R. Co., 49 N. Y. 491; Talcott v. Wabash R. Co., 159 N. Y. 461, 54 N. E. 1.

On demurrer all reasonable intendments are indulged in support of the pleading demurred to; nevertheless "it is the duty of a party to present a clear and unequivocal statement of his cause of action or defense, and, when a material statement is susceptible of two meanings, the one most unfavorable to the pleader must be taken." Clark v. Dillon, 97 N. Y. 370. I think, then, the complaint, including as it does the bill of lading limiting liability to the defendant's own road, does not state a cause of action, unless it be saved by the provisions of the act of Congress passed June 29, 1906 (34 U. S. Stat. [59th Cong.] 595, c. 3591, § 7 [U. S. Comp. St. Supp. 1909, p. 1166]), providing:

"That any common carrier, railroad or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt, or bill of lading therefor, and shall be liable to the lawful holder thereof, for any loss, damage or injury to such property caused by it or by any carrier, railroad or transportation company to which such property may be delivered, or over whose line, or lines such property may pass, and no contract, receipt, rule or regulation shall exempt said common carrier, railroad, or transportation company from the liability hereby imposed."

The statute further provides that the initial carrier may recover over from the carrier on whose line a loss occurs the amount paid by it on account thereof.

This, if applicable to the case in hand, would seem to answer the defendant's claim of its nonliability for loss by reason of the negligence of a connecting line. Shidlovsky v. Mallory S. S. Co., 60 Misc. Rep. 67, 111 N. Y. Supp. 778; Greenwald v. Weir, 59 Misc. Rep. 431, 111 N. Y. Supp. 235.

Whether the statute applies to interstate carriers only, or to intrastate carriers as well, presents a most important question, involving the right of recovery here, not only, but affecting interests connected with other roads. Is it a statute affecting commerce between the several states—out of one into another—or does it apply to roads wholly within a state, but having one or more connections with lines that carry beyond the state?

The statute is entitled "An act to regulate commerce among the several states." A shipment of freight from Skaneateles, N. Y., to Roanoke, Va., evidently would come within the definition of "interstate commerce," and in a sense is subject to the provisions of subdivision 3, § 8, art. 1, of the federal Constitution, giving Congress power to regulate commerce among the several states (Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346; People v. Wemple, 138 N. Y. 1, 33 N. E. 720); and, where Congress may not have legislated on the subject of interstate commerce, and a state has assumed to so legislate, the power of Congress remains, and the state legislation is not effective, except as to incidental matters affecting local interests only (People v. Wemple, supra; Fargo v. Michigan, 121 U. S. 230, 7 Sup. Ct. 857, 30 L. Ed. 888), such as harbor pilotage, beacons, buoys, and the improvement of harbors, bays, and navigable rivers within a state, if their free navigation under the laws of the United States be not thereby impaired. (County of Mobile v. Kimball, 102 U. S. 691, 26 L. Ed. 238).

In the case at bar the goods themselves were to be carried out of this and into another state. The defendant, however, was a domestic corporation, doing its business wholly within the state, except as it participated in passing the goods along to other lines carrying beyond the state line and to the place of destination. The defendant set in motion the carriage of the commodity, and thus directly, or indirectly, made connection with a carrier transporting the freight into another state. The question then arises whether it was engaged in interstate commerce so as to come within the Constitution and under the control of the provisions of the act of Congress.

The point where jurisdiction of the state to regulate domestic commerce ends and that of the federal government to regulate interstate commerce begins has been the subject of much discussion and may not yet have been in all things specifically determined. The leaning seems to have been in favor of the paramount authority of the federal government as against the state in cases of doubt. 1 Kent, Comm. 431 et seq., whether of commerce or kindred matters. This is apparently the opinion of both the state and federal courts. Fitch v. Livingston, 4 Sandf. 492; The Daniel Ball, 77 U. S. 557, 19 L. Ed. 999; 7 Cyc. 421.

" 'In the application of this comprehensive definition (interstate commerce), it is settled by declarations of the Supreme Court that such commerce includes, not only the actual transportation of commodities and persons between the states, but also the processes of such transportation; that is, it includes all the negotiations and contracts which have as their object, or involve as an element thereof, such transmission or passage from one state to another; and such commerce begins, and the regulating power of Congress attaches, when the commodity or thing traded in commences its transportation from the state of its production to some other state, and terminates when the transportation is completed and the property has become a part of the general mass of the property in the state of its destination.' Just when this commerce begins is not determined by the character of the commodity, nor by the intention of the owner to transfer it to another state, nor by his preparation of it for transportation, but it is fixed by its actual delivery to a carrier for transportation, or the actual commencement of its carriage to the other state at such time; that is to say, when the carriage commences the regulating authority of the state ceases, and that of the federal power attaches, and continues until the mixing of the property with the general mass in the state of its destination." 4 Words & Phrases, p. 3726, cases cited, page 3727.

The Grand river, in the state of Michigan, is held to be a navigable stream from its mouth to Grand Rapids, a distance of 40 miles, being capable of bearing a steamer of 123 tons burden laden with merchandise and passengers and forming, by its connection with vessels on Lake Michigan, a continuous way of commerce, both to other states and foreign countries, and subject to the control of Congress. The Daniel Ball, supra. The court there states (page 565 of 77 U. S. [19 L. Ed. 999]):

"So far as she (the steamer) was employed in transporting goods destined for other states, or goods brought from without the limits of Michigan and destined to places within that state, she was engaged in commerce between the states, and, however limited that commerce may have been, she was, so far as it went, subject to the legislation of Congress. She was employed as an instrument of that commerce; for, whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced. The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one state, and some through two or more states, does in no respect affect the character of the transaction. To the extent in which each agency acts in that transportation, it is subject to the regulation of Congress."

In that case it was argued by counsel that, if the Grand river from Grand Rapids to its mouth were to be deemed a national highway, to the extent that Congress might regulate the commerce upon it, then every road which would lead to some other highway which might directly or indirectly eventually cross the state line into another state would be subject to the constitutional provisions for the regulation of commerce between the states. The court stated the argument in these words:

"It is said that, if the position here asserted be sustained, there is no such thing as the domestic trade of a state; that Congress may take the entire control of the country and extend its regulations to the railroads within a state on which grain or fruit is transported to a distant market. We answer that the present case relates to transportation on the navigable waters of the United States, and we are not called upon to express an opinion upon the power of Congress over interstate commerce when carried on by land transportation. And we answer further that we are unable to draw any clear and distinct line between the authority of Congress to regulate an agency employed

in commerce between the states, when that agency extends through two or more states and when it is confined in its action within the limits of a single state."

Much stress, however, may be laid on the fact that the Grand river is a navigable stream emptying into one of the Great Lakes; but in other cases of river navigation, notwithstanding the stream was within a state and the carriage was from one point to another of the same state, it was held that vessels navigating the river were subject to admiralty jurisdiction.

"The District Court of the United States for the Northern District of Illinois as a court of admiralty, has jurisdiction of a suit in rem against a steam canal boat to recover damages caused by a collision between her and another canal boat, while the two boats were navigating the Illinois and Lake Michigan Canal, at a point about four miles from its Chicago end, and within the body of Cook county, Ill., although the libelant's boat was bound from one place in Illinois to another place in Illinois." Matter of Boyer, 109 U. S. 629, 3 Sup. Ct. 434, 27 L. Ed. 1056.

"The law of limited liability is a part of the maritime law of the United States and is in force upon navigable rivers above tide water and applies to enrolled and licensed vessels in commerce on such river." Matter of Garnett, 141 U. S. 1, 11 Sup. Ct. 840, 35 L. Ed. 631.

"A steamboat, when owned by citizens of this state and exclusively employed as a ferryboat on the waters within the limits of the state, is bound to take out a license and have inspection under the act of Congress of July 7, 1838 [5 Stat. 304, c. 111]." U. S. v. Jackson, 4 N. Y. Leg. Obs. 450, Fed. Cas. No. 15,458.

The Garnett Case was that of a steamer engaged in carrying trade between Augusta and Savannah, on the Savannah river; both ports being in the state of Georgia. The Jackson Case was that of a ferryboat used exclusively on the East river and running from the city of New York across to Williamsburg, both in the state of New York.

Somewhat similar holdings have been made as to railroads.

"When a state railroad company whose road lies within the limits of a state enters into the carriage of foreign freight by agreeing to receive the goods by virtue of foreign through bills of lading, and to participate in through rates of charges, it thereby becomes a part of a continuous line not made by a consolidation with the foreign companies, but by an arrangement for the continuous carriage or shipment from one state to another, and thus becomes amenable to the Federal act in respect to such interstate commerce." Cincinnati, O. & T. P. R. Co. v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935.

A statute of Illinois enacted that, if any railroad company should within that state charge or receive for transportation passengers or freight of the same class, the same or a greater sum for any distance, than it does for a longer distance, it shall be liable to a penalty for unjust discrimination.

A railroad company made such discrimination in regard to goods transported over its road or roads from Peoria, in Illinois, and from Gillman, in Illinois, to New York, charging more for the same class of goods carried from Gillman than from Peoria, the former being 86 miles nearer to New York than the latter, this difference being in the length of the line within the state of Illinois, and it was held that such transportation was "commerce among the states," even as to that part of the voyage which lies within the state of Illinois, and that the stat-

ute was void. Wabash, St. L. & R. I. R. R. Co. v. State of Illinois, 118 U. S. 557, 7 Sup. Ct. 4, 30 L. Ed. 244.

But a carrying of goods on the land that begins and ends in the same state, though the route diverge into and out of another state, is subject only to the jurisdiction and control of the state. Lehigh Valley R. Co. v. Com. of Pennsylvania, 145 U. S. 192, 12 Sup. Ct. 806, 36 L. Ed. 672. Intrastate commerce on land must be a transaction wholly by a shipper to the consignee, by which the former delivers his goods by carrier to the latter within the same state. Id., 145 U. S. 200, 12 Sup. Ct. 806, 36 L. Ed. 672.

Regulations requiring safety appliances on railroads engaged in interstate commerce are within the power of Congress. Johnson v. Southern Pacific R. R. Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363. So, also, the liability of employers to their employés, except where it is attempted to be applied to intrastate business as well. Howard v. Illinois Central R. R. Co., 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297.

Elevators have been held to do a business of state concern, and not to be within the inhibition of the commerce provision of the Constitution, notwithstanding grain coming from a common carrier of one state may be stored, in transit, to be delivered by a carrier to another state.

"Their regulation is a thing of domestic concern, and, certainly, until Congress acts in reference to their interstate relations, the state may exercise all the powers of government over them, even though in so doing it may indirectly operate upon commerce outside its immediate jurisdiction.

"We do not say that a case may not arise in which it will be found that a state, under the form of regulating its own affairs, has encroached upon the exclusive domain of Congress in respect to interstate commerce, but we do say that, upon the facts as represented to us in this record, that has not been done." Munn v. State of Illinois, 94 U. S. 113, 135, 24 L. Ed. 77.

In the case at bar it must be presumed that there was some traffic arrangement, express or implied, as to receipt, carriage or delivery of goods, and division of profits between the defendant and its connecting lines, and that each acted in a sense as the agent of the other. There were, no doubt, mutual obligations and benefits. Of course, what was the agreement concerning them the pleading does not disclose and, upon a trial, would no doubt be difficult, perhaps impossible, for the plaintiffs to ascertain; yet, like trafficking arrangements are frequently made. Swift v. Pacific Mail S. S. Co., 106 N. Y. 206, 12 N. E. 583.

Within the authorities it seems to me that the defendant's road, though a short one and wholly within the state of New York, constituted in the case at bar a "link in the chain" which carried the goods in question out of this and into another state. It made a contract so far as to set in motion the commerce from Skaneateles to Roanoke; it billed the goods to a destination in another state, carried them part of the way, then delivered to a connecting line, which in turn forwarded them to other lines and presumably shared in the advantages coming from the service. What the defendant actually did seems to me to be a fair test of what it is, whether a domestic carrying wholly within the state or a carrying both within and without the state. While it may seem a strained construction, I am inclined to hold that the de-

fendant in the transaction in question was engaged in interstate commerce and thereby subjected itself to the law of Congress.

The statute as to the liability of the initial carrier is in accord with the law of England (Meeschamp v. Lancaster & Preston Junction R. R. Co., 8 M. & W. 421) and of at least two of the states (Lock Co. v. Railroad Co., 48 N. H. 339, 2 Am. Rep. 242; Allen, etc., Co. v. Pacific R. R. Co., 42 Wash. 64, 84 Pac. 620).

It remains now to ascertain whether the plaintiffs are the proper parties to bring suit, and whether the state courts have jurisdiction in an action to recover the loss of the plaintiffs' goods.

As to the first it hardly seems necessary to argue. The cabbages were plaintiffs' property. They contracted with the defendant to deliver them to the consignee by and through connecting carriers. The consignee was bound to accept them only on delivery in a fairly good merchantable condition. Title remained in the plaintiffs until such delivery and acceptance. Hence the plaintiffs were the real parties in interest and entitled to bring action. Rodgers v. Phillips, 40 N. Y. 519; Kein v. Tupper, 52 N. Y. 550, 553; Hargous v. Stone, 5 N. Y. 73, 76; Code Civ. Proc. § 449.

As to the second: It will be observed that the statute expressly requires delivery to the shipper of a receipt or bill of lading and provides:

"Nothing in this section shall deprive any holder of such receipt or bill of la'ding of any remedy or right of action which he has under existing law."

This would seem to preserve all common law remedies, so far as the tribunal and form of action are concerned, to an owner of goods against a defaulting carrier. Moreover, it has been held in many cases that, where federal statutes do not explicitly prescribe the forum for the enforcement of rights in actions at law given by federal statutes, state courts have concurrent jurisdiction. Teall v. Felton, 1 N. Y. 537, 49 Am. Dec. 352; Claflin v. Houseman, 93 U. S. 130, 23 L. Ed. 833; Murry v. Railroad Co. (C. C.) 62 Fed. 24; Ansley v. Patterson, 77 N. Y. 156; Thompson v. Sweet, 73 N. Y. 622; Eyster v. Gaff, 91 U. S. 521, 23 L. Ed. 403.

The demurrer is overruled, and interlocutory judgment directed for the plaintiffs, with costs, but with leave to defendant to answer within 20 days, if so advised, on payment of costs.

.Demurrer overruled, with costs.