## LEHIGH VALLEY RAILROAD COMPANY v. PENNSYLVANIA.

ERROR TO THE SUPREME COURT OF THE STATE OF PENNSYLVANIA.

No. 275. Argued April 5, 1892. — Decided May 2, 1892.

state tax against a railroad corporation, incorporated under its laws, on account of transportation done by it from one point within the State to another point within it, but passing during the transportation without the State and through part of another State, is not a tax upon interstate commerce, and does not infringe the provisions of the Constitution of the United States.

THE court stated the case as follows:

April 28, 1887, the auditor general of Pennsylvania settled an account with the Lehigh Valley Railroad Company, in accordance with the act of June 7, 1879, of that Commonwealth, for its taxes on gross receipts for the six months ending December 31, 1886, as follows:

| | | |
|---|---|---|
| "Gross receipts .......................... | $4,798,933 | 54 |
| Proportion taxable in Pennsylvania, $\frac{26069}{32661}$ .. | 3,835,926 | 60 |
| Tax at rate of eight-tenths of one per cent.. | 30,642 | 88 |
| Due Commonwealth.................... | $30,642 | 88 " |

This settlement was approved by the state treasurer June 3, 1887. The Lehigh Company thereupon prayed an appeal to the Court of Common Pleas of Dauphin County, Pennsylvania, where a declaration and copy of account were filed and the case tried under stipulation by the court without a jury. Upon the trial it appeared from the affidavit of the treasurer of the Lehigh Company, given November 10, 1887, that he had made to the auditor general for the six months ending December 31, 1886, the report of gross receipts upon which the account for taxes had been settled, and further that "the main line of railroad operated by the Lehigh Valley Railroad Company extends from Perth Amboy, in the State of New

Jersey, to Wilkesbarre, in the State of Pennsylvania, with numerous branches in Pennsylvania and New Jersey. The company has also running arrangements with other companies whereby it runs its own trains, both passenger and freight, on a through line from Jersey City, New Jersey, to Buffalo, New York. A very large portion of its business consists of the transportation of freight, passengers, etc., from points in Pennsylvania to points in other States or from points in other States to points in Pennsylvania, or from points in other States to points in other States, passing through the State of Pennsylvania, about one-half of its entire receipts being derived from the transportation of anthracite coal from Pennsylvania into other States."

The affidavit gave a detailed statement showing the several classes of transportation from which the receipts returned were derived, being from transportation of coal; freight other than coal; passengers, express, and mail; distributed as in a summary, with which the statement concluded, and which was as follows:

"1. Total receipts from transportation from points in Pennsylvania to other points in Pennsylvania without passing out of the State............................. $1,353,441 50

2. Total receipts from transportation by continuous carriage from points in Pennsylvania to other points in Pennsylvania, but over lines partly in Pennsylvania — that is to say, passing out of Pennsylvania into other States and back again into Pennsylvania in course of transportation............................... 207,660 42

3. Total receipts from transportation by continuous carriage from points in a foreign State to other points in the same State passing through the State of Pennsylvania ............................... 50,494 25

4. Total receipts from transportation by con-

tinuous carriage from points in other
States to points in Pennsylvania...... 292,422 00
5. Total receipts from transportation by con-
tinuous carriage from points in Penn-
sylvania to points in other States ..... 2,569,514 58
6. Total receipts from transportation by con-
tinuous carriage from points in a foreign
State, passing through Pennsylvania,
and ending in a third State........... 267,868 59
7. Total receipts from transportation from
points in foreign States to other points
in foreign States not touching Pennsyl-
vania .............................. 57,532 19

Total receipts ................. $4,798,933 53"

In another affidavit, under date January 20, 1888, the same
official stated : " Wherever in the said statement of November
tenth, 1887, I used the term ' continuous transportation' or
' continuous carriage,' the freight or passengers, from the
transportation of which the receipts were derived were car-
ried between the points mentioned for a single sum or charge
and upon a single way-bill or ticket, and were, when taken
upon the cars of this company, destined to be carried and
were actually carried from point to point as in said statement
set forth. The Lehigh Valley Railroad Company has no
railroad of its own reaching the city of Philadelphia, but
transports coal and other merchandise, and sometimes passen-
gers, from Mauch Chunk and other points in Pennsylvania
over its own line to Phillipsburg, in the State of New Jersey,
from which point it is carried upon the Belvidere and Dela-
ware Railroad to Trenton, and thence by the Pennsylvania
Railroad lines to the city of Philadelphia. So far as the
Lehigh Valley Railroad line is concerned the transportation
is from Mauch Chunk, or the other points in Pennsylvania, to
Phillipsburg, in New Jersey; but by arrangements between
this company and the corporations owning the other roads
the transportation is continuous from Mauch Chunk and the
other points in Pennsylvania to Philadelphia. The receipts

mentioned in my statement of November tenth in the second paragraph in each instance under the respective heads of 'coal,' 'freight other than coal,' and 'passenger, express and mail,' and also in the second item in the summary, were derived in the manner above explained. Some of the trains, and in many instances the same cars, which carried the freight and passengers indicated between the points in Pennsylvania and the city of Philadelphia carried also freight and passengers destined and carried from points in Pennsylvania to points in New Jersey and New York, and *vice versa.* The various items of receipts shown in my statement of November tenth and classified in the third paragraph of the summary as 'receipts from transportation by continuous carriage from points in a foreign State to other points in the same State, passing through the State of Pennsylvania,' were derived from transportation of freight and passengers billed or ticketed from the city of New York to other points in the State of New York, and *vice versa.* The same trains and the same cars which carried the said freight and passengers carried also freight and passengers destined and carried from points in Pennsylvania to points in other States and from points in other States to points in Pennsylvania."

It was admitted that the Lehigh Company was originally incorporated by the State of Pennsylvania, and that it owned and operated as part of its main line about sixty-six miles of railroad in New Jersey.

The fraction of the entire gross receipts given in the settlement represented the Lehigh Company's mileage within the State.

The Court of Common Pleas found the facts, and held, for the reasons given in *Commonwealth.* v. *Delaware & Hudson Canal Co.,* 21 Weekly Notes of Cases (Penn.) 406, and *Commonwealth* v. *New York, Lake Erie & Western Railroad Company, Ib.* 410, that the Commonwealth could only recover taxes upon the two items of $1,353,441.50 and $207,660.42; (classes one and two,) being the amount received for transportation between points both of which were in the State; and directed judgment accordingly, which, exceptions thereto having been over-

ruled, was thereupon entered. The case was carried by writ of error to the Supreme Court of Pennsylvania and the judgment affirmed upon the opinion of the court below. A writ of error was then sued out from this court.

The company, conceding its liability to taxation in respect of the receipts contained in class one, questions by its assignment of errors the validity of the tax as to the receipts in class two.

*Mr. M. E. Olmstead* for plaintiff in error.

The seventh section of the Pennsylvania revenue statute of June 7, 1879, which has since been repealed, was twice before this court, and, in each instance, condemned as unconstitutional in so far as it imposed a tax upon receipts derived from inter-state commerce. *Philadelphia & Southern Steamship Co.* v. *Pennsylvania*, 122 U. S. 326; *Western Union Telegraph Co.* v. *Pennsylvania*, 128 U. S. 39.

The state court concedes the invalidity of the tax in question in this case, as applied to receipts from interstate commerce; but it holds that the receipts of the Lehigh Valley Railroad Company for transportation from Mauch Chunk, Pennsylvania, to Phillipsburg, New Jersey, of freight and passengers, which, at Phillipsburg, were taken upon the system of the Pennsylvania Railroad Company and by it transported more than fifty miles through the State of New Jersey to Trenton, and from there back again into Pennsylvania for ultimate delivery at Philadelphia, to which point the transportation from Mauch Chunk was, by agreement between the companies, continuous, is not interstate commerce. The company contends that it is, and that is the only question in dispute.

Was this transportation *intra*-State or was it *inter*-State? If, as the company contends, it was interstate transportation, it was interstate commerce; for this court has often decided that transportation is not merely an aid to, or an instrument of, commerce, but is itself commerce. *The Passenger Cases*, 7 How. 283–416; *State Freight Tax*, 15 Wall. 232; 275; *State Tax on Railway Gross Receipts*, 15 Wall. 284, 299; *Fargo* v. *Michi-*

*gan*, 121 U. S. 230, 247; *Wabash Railway Co.* v. *Illinois*, 118 U. S. 557.

In short, in a very long line of cases, which are too familiar to require citation, this court has always and invariably proceeded upon the theory that transportation is commerce; and, wherever the transportation involved has been of an interstate or international character, its regulation by the States has been invariably prohibited; and the only transportation which the States have been permitted to control or regulate is that which is completely internal, and does not in any way affect or concern any other State.

In the article on interstate commerce in 11 Am. & Eng. Encyclopedia of Law, 539, the following is given as the definition of that term, viz.: "Interstate commerce, or commerce 'among the several States' of the American Union, is commerce which concerns more States than one;" and numerous decisions of this court are there cited sustaining that definition. And this declaration is in entire harmony with the rulings of this court. *Gibbons* v. *Ogden*, 9 Wheat. 1, 189, 193, 194; *State Tonnage Tax Cases*, 12 Wall. 204, 214; *Hall* v. *DeCuir*, 95 U. S. 485, 491; *Fargo* v. *Michigan*, 121 U. S. 230.

It is clear that under these decisions, the State of New Jersey could not interfere with this transportation in any way, because it is interstate commerce as to that State. But if so as to New Jersey, why is it not so also as to Pennsylvania?

In *Coe* v. *Errol*, 116 U. S. 517, a quantity of logs had been cut in the State of Maine and put into the Androscoggin River for the purpose of floating them down to Lewiston, in the same State. The Androscoggin River starts in Maine, but, after running a distance through that State, crosses the line and runs a distance through the State of New Hampshire, and then back again into the State of Maine. It was customary to leave the logs at the town of Errol, in New Hampshire, for one year. Other logs were cut in New Hampshire and drawn down to Errol to be floated also to the State of Maine. The taxing authorities taxed all these

logs at Errol. But this court said that goods on their way through a State from a place outside thereof to another place outside thereof, are in course of interstate or foreign transportation, and are subjects of interstate or foreign commerce, and not taxable by the State through which they are passing, even though detained within that State by low water or other temporary cause. Such goods are already in the course of commercial transportation, and are under the protection of the Constitution. Thus we see that transportation from one State to another point in the same State, passing through another State in the course of the transportation, has been already held by this court to be interstate transportation.

In *Lord* v. *Steamship Company*, 102 U. S. 541, the steamship Ventura was employed in navigation between San Francisco and San Diego, both in the State of California, touching also at intermediate ports on the coast in said State. She neither took on nor put off goods outside of the State of California, but in making her voyage passed out upon the Pacific Ocean, out of the State of California and in again. As stated by Mr. Chief Justice Waite, who delivered the opinion (p. 543): "The single question presented by the assignment of errors is whether Congress has power to regulate the liability of the owners of vessels navigating the high seas, but engaged only in the transportation of goods and passengers between ports and places in the same State. It is conceded that while the Ventura carried goods from place to place in California, her voyages were always ocean voyages."

That question was decided in the affirmative, and it was held that the Ventura on her voyage "entered on a navigation which was necessarily connected with other nations," and that, although she was not trading with them, "she was navigating with them, and consequently with them was engaged in commerce. . . . In every just sense, therefore, she was, while on the ocean, engaged in commerce with foreign nations, and as such she and the business in which she was engaged were subject to the regulating power of Congress."

Nor does it make any difference that, as suggested by the learned trial judge, the distance of transportation in another State may be very short. In the cases at bar the distance was not short. The transportation through New Jersey was for more than fifty miles; but had it been for a much less distance, the principle would have been the same. In *Pennsylvania v. Gloucester Ferry Company*, 114 U. S. 196, this court unanimously condemned the Pennsylvania taxing statute upon the ground that, as stated in the syllabus: "The transportation of passengers and freight for hire by a steam ferry across the Delaware River from New Jersey to Philadelphia by a corporation of New Jersey is interstate commerce, which is not subject to exactions by the State of Pennsylvania." The transportation was simply across the comparatively narrow river between Philadelphia and Camden, which cities are within sight of each other.

*Mr. James A. Stranahan,* Deputy Attorney General of the State of Pennsylvania, for defendant in error.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The Lehigh Valley Railroad Company is a Pennsylvania corporation, which owns and operates an extensive system of railroads in that State, but has no line of its own to Philadelphia. For the traffic from Mauch Chunk to Philadelphia, it makes use of two routes, one by the way of the Philadelphia and Reading road, being wholly within the State, and the other by its own line connecting with the lines of the Pennsylvania Railroad at Phillipsburg, New Jersey, and thence *via* Trenton, in that State, to Philadelphia. Detailed reports of its receipts show that the passenger traffic of the Lehigh Company to Philadelphia from Mauch Chunk is almost wholly taken over the Philadelphia and Reading, while its coal and general freight traffic reaches Philadelphia by the other road. Phillipsburg, New Jersey, lies across the Delaware River, opposite Easton, Pennsylvania. By the running arrangements

between the Lehigh and Pennsylvania Companies, the transportation of through freight and passengers is continuous from Mauch Chunk to Philadelphia.

The receipts named in class two are confined to that part of the transportation from Mauch Chunk to Phillipsburg, and the taxation to the mileage wholly within the State of Pennsylvania; and the question is whether this taxation in respect of such receipts from freight and passengers carried by continuous transportation to Philadelphia from Mauch Chunk by way of Trenton, New Jersey, amounts to a regulation of interstate commerce.

The conflict between the commercial regulations of the several States was destructive to their harmony and fatal to their commercial interests abroad, and this was the mischief intended to be obviated by the grant to the Congress of the power to regulate commerce with foreign nations and among the States. But, as was said by Chief Justice Marshall, the words of the grant do not embrace that commerce which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to nor affect other States. "Commerce," observed the Chief Justice, "undoubtedly, is traffic, but it is something more; it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." *Gibbons* v. *Ogden*, 9 Wheat. 1, 189. This is no more than an expansion of its simplest signification, that of an exchange of goods, the bringing of them from the seller to the buyer, however vast the range now comprehended by the term in the progress of society.

Taxation is undoubtedly one of the forms of regulation, but the power of each State to tax its own internal commerce, and the franchises, property or business of its own corporations engaged in such commerce, has always been recognized, and the particular mode of taxation in this instance is conceded to be in itself not open to objection. And while interstate commerce cannot be regulated by a State by the laying of taxes thereon, in any form, yet whenever the subjects of taxation

can be separated so that that which arises from interstate commerce can be distinguished from that which arises from commerce wholly within the State, the distinction will be acted upon by the courts, and the State permitted to collect that arising upon commerce solely within its own territory. *Ratterman* v. *West. Union Tel. Co.*, 127 U. S. 411, 424.

The tax under consideration here was determined in respect of receipts for the proportion of the transportation within the State, but the contention is that this could not be done because the transportation was an entire thing, and in its course passed through another State than that of the origin and destination of the particular freight and passengers. There was no breaking of bulk or transfer of passengers in New Jersey. The point of departure and the point of arrival were alike in Pennsylvania. The intercourse was between those points and not between any other points. Is such intercourse, consisting of continuous transportation between two points in the same State, made interstate because in its accomplishment some portion of another State may be traversed? Is the transmission of freight or messages between two places in the same State made interstate business by the deviation of the railroad or telegraph line on to the soil of another State?

If it has happened that through engineering difficulties, as the interposition of a mountain or a river, the line is deflected so as to cross the boundary and run for the time being in another State than that of its principal location, does such detour in itself impress an external character on internal intercourse? For example, the Nashville, Chattanooga and St. Louis Railway Company is a corporation created under the laws of Tennessee, and through freight and passengers transported from Nashville to Chattanooga pass over a few miles in Alabama and perhaps two miles in Georgia, but we had not supposed that that circumstance would render the taxation of that company, in respect of such business, by the State of Tennessee invalid.

So as to the traffic of the Erie Railway between the cities of New York and Buffalo, we do not understand that that company escapes taxation in respect of that part of its busi-

ness because some miles of its road are in Pennsylvania, while the New York Central is taxed as to its business between the same places, because its rails are wholly within the State of New York.

It should be remembered that the question does not arise as to the power of any other State than the State of the termini, nor as to taxation upon the property of the company situated elsewhere than in Pennsylvania, nor as to the regulation by Pennsylvania of the operations of this or any other company elsewhere, but it is simply whether, in the carriage of freight and passengers between two points in one State, the mere passage over the soil of another State renders that business foreign, which is domestic. We do not think such a view can be reasonably entertained, and are of opinion that this taxation is not open to constitutional objection by reason of the particular way in which Philadelphia was reached from Mauch Chunk.

Nor is the contrary conclusion supported by *Coe* v. *Errol,* 116 U. S. 517, and *Lord* v. *Steamship Company,* 102 U. S. 541, much relied on by plaintiff in error.

In *Coe* v. *Errol,* logs cut in Maine and detained at Errol, New Hampshire, on their way down the Androscoggin River to Lewiston, Maine, were held by the Supreme Court of New Hampshire not taxable at Errol, while logs cut in New Hampshire and hauled down to that town for similar transportation were held taxable, and this court sustained the judgment of the state court in reference to the New Hampshire logs, upon the ground that they were still part of the general mass of property of the State, and had not commenced "their final movement for transportation from the State of their origin to that of their destination." The Maine logs had never been part of the property of New Hampshire, and had no *situs* there. They were therefore not taxable, though whether they were or not was not drawn into decision. These logs were also in course of transportation from the place of cutting to another place likewise in Maine, and as that transportation required them to arrive and remain for a time in New Hampshire, the predicament in that regard was referred to in the

opinion by way of argument, as being such that New Hampshire could not impose a burden on that transportation. But the right of Maine to tax them was not disputed.

The single question in *Lord* v. *Steamship Company* was, as stated by Mr. Chief Justice Waite, delivering the opinion of the court, whether Congress had power to regulate the liability of the owners of vessels navigating the high seas, but engaged only in the transportation of goods and passengers between ports and places in the same State, it being conceded that the voyages of the steamship in respect of whose loss the question arose were always ocean voyages. The argument was that " while on the ocean her national character only was recognized, and she was subject to such laws as the commercial nations of the world had, by usage or otherwise, agreed on for the government of the vehicles of commerce occupying this common property of all mankind. She was navigating among the vessels of other nations and was treated by them as belonging to the country whose flag she carried. True, she was not trading with them, but she was navigating with them, and consequently with them was engaged in commerce. If in her navigation she inflicted a wrong on another country, the United States, and not the State of California, must answer for what was done. In every just sense, therefore, she was, while on the ocean, engaged in commerce with foreign nations, and as such, she and the business in which she was engaged was subject to the regulating power of Congress."

But it was unnecessary to invoke the power to regulate commerce in order to find authority for the law in question. As stated by Mr. Justice Bradley in *In re Garnett*, 141 U. S. 1, 12 : " The act of Congress which limits the liability of ship owners was passed in amendment of the maritime law of the country, and the power to make such amendments is coextensive with that law. It is not confined to the boundaries or class of subjects which limit and characterize the power to regulate commerce ; but, in maritime matters, it extends to all matters and places to which the maritime law extends." In that case the limited liability act was applied to a steamer engaged in commerce on the Savannah River.

In *Ex parte Boyer*, 109 U. S. 629, it was decided that the admiralty jurisdiction extended to a steam canal-boat, in case of collision between her and another canal-boat, whilst the two boats were navigating the Illinois and Lake Michigan Canal, although the libellant's boat was bound from one place in Illinois to another place in the same State.

The principle is well settled, and the cases are largely referred to in *In re Garnett*.

In *Pacific Coast Steamship Co.* v. *Board of Railroad Commissioners*, 9 Sawyer, 253, the Circuit Court for the District of California held, Mr. Justice Field delivering the opinion, that the California State Board of Railroad Commissioners had no power to regulate or interfere with the transportation of persons or merchandise by a steamship company between ports within the State, if they were in transit to or from other States, or if the transportation consisted of voyages upon the ocean, bringing the steamships under the exclusive control of Congress.

But that case involved the direct regulation by a State of transportation which had passed beyond the jurisdiction of the State, and did not decide the question of the power of a State to tax its own corporations in respect of transactions within it in the course of a continuous carriage from one point to another in the State, in accomplishing which a part of another State was incidentally traversed.

This Pennsylvania Company was not taxed in respect of its receipts from transportation from points in foreign States to other points in foreign States not touching Pennsylvania; nor from transportation by continuous carriage from points in a foreign State passing through Pennsylvania and ending into a third State; nor from transportation by continuous carriage from points in Pennsylvania to points in other States; nor from transportation by continuous carriage from points in other States to points in Pennsylvania; nor from transportation by continuous carriage from points in another State to other points in the same State passing through Pennsylvania; but only in respect of receipts from transportation from points in Pennsylvania to other points in Pennsylvania without pass-

ing out of the State, and from transportation by continuous carriage from points in Pennsylvania to other points therein, but passing out of Pennsylvania into another State and back again in the course of transportation.

We do not deem it necessary to continue the discussion. We concur with the state court in sustaining the validity of the tax herein involved, and the judgment is

*Affirmed.*