## KANSAS CITY S. RY. CO. v. BOARD OF RAILROAD COM'RS OF ARKANSAS.

(Circuit Court, W. D. Arkansas, E. D.   February 5, 1901.)

CARRIERS—POWER OF STATE TO REGULATE FREIGHT CHARGES—COMMERCE AMONG THE STATES.

    A state has no power to regulate the charges of a railroad company for the carriage of goods between two points in the state, where the course of transportation must be for a considerable part of the distance through another state or territory. Such transportation, although continuous and made on through bills of lading, constitutes commerce "among" the states, within the meaning of the commerce clause of the federal constitution, and is subject to regulation by congress alone.[1]

In Equity.   Suit for injunction.   On demurrer to bill.

The allegations in the bill are:   That the complainant is a railroad corporation existing under the laws of the state of Missouri, owning a line of railroad, and operating it as a common carrier of passengers and freight, from Kansas City, in the state of Missouri, to Ogden, on the line dividing the states of Arkansas and Texas. That said railroad traverses parts of the following states and territories, to wit: Missouri, Arkansas, Kansas, and the Indian Territory. That after leaving the state of Missouri it runs through the state of Arkansas for 28.649 miles; thence through the Indian Territory for a distance of 127.781 miles; then again into the state of Arkansas, which it traverses for a distance of 117.618 miles. That it also has a branch line from Spiro, in the Indian Territory, to Ft. Smith, in the state of Arkansas, 15 miles of which is in the Indian Territory and 1 mile in the state of Arkansas. That it also owns other branches, running from points in the state of Texas and the Indian Territory for short distances to points in the state of Arkansas, and along which lines there are numerous stations to and from which freight is shipped. That whenever any freight is shipped from these stations to Ft. Smith, or from Ft. Smith to them, such shipments must of necessity pass over complainant's line of railroad extending through the Indian Territory, and to points in Miller county, Ark.; also through the state of Texas. That the defendants, who compose the railroad commission of the state of Arkansas, claim and assert, under the authority

---

[1] State laws interfering with interstate or foreign commerce, see note to McCanna & Fraser Co. v. Citizens' Trust & Security Co., 24 C. C. A. 13.

of that state, the right to regulate the charges for carrying freight by complainant from and to places in the state of Arkansas, where the course of transportation is mostly through and over the Indian Territory or in the state of Texas, and have prescribed rates of charges for freight thus transported for the largest portion through the Indian Territory or state of Texas, and threaten, upon the refusal of complainant to comply with their schedules of charges, to visit it with the penalties prescribed by the laws of the state of Arkansas for violations of the orders of the railroad commission. That in pursuance of their alleged authority they have cited complainant to appear before them and answer the complaint of citizens of the state of Arkansas, by reason of the fact that complainant charges for the transportation of freight from Ft. Smith, Ark., to Granniss, in the same state, passing in the course of transportation through the Indian Territory for the largest portion of the trip, a rate in excess of that prescribed by the commission, although the shipment complained of was a continuous one from Ft. Smith to Granniss, on a through bill of lading, and moved in the state of Arkansas only 52.155 miles, and in the Indian Territory a distance of 63.841 miles. That upon the hearing of said complaint the commissioners made a finding that complainant had been guilty of an overcharge, and by reason thereof is liable to prosecution for the penalties prescribed by the laws of the state of Arkansas. That the complainant's plea to the jurisdiction of the commission was by it overruled; it claiming to have the power to regulate charges for shipments between points in the state of Arkansas, although the largest portion of the haul was through and over the Indian Territory. That the penalty prescribed by the laws of the state of Arkansas for each violation of the order of the commission is a fine of not less than $500 nor more than $3,000, to be recovered by an action instituted by the state's attorneys; or, if not instituted by them within 15 days, such action may be instituted by any attorney, who is to receive for his services 25 per cent. of the penalty imposed and recovered. The bill further charges that complainant does a large carrying business between stations in the state of Arkansas, but which it must carry principally on the line of road in the state of Texas and the Indian Territory, and, if the defendants are not restrained by injunction, a large number of suits will be instituted by parties against complainant for the penalties prescribed by the laws of the state, to the great detriment and irreparable injury of complainant. A temporary injunction having been granted, after due notice thereof to the defendants, the defendants have filed a demurrer to the bill upon the ground that, upon the allegations made, complainant is not entitled to any relief.

Lathrop, Morrow, Fox & Moore, A. W. Lucas, and Read & McDonough, for complainant.

Felix M. Hanley and Winchester & Martin, for defendants.

TRIEBER, District Judge (after stating the facts). The only question involved and argued by counsel is whether, upon the facts set out in the bill, the carriage of freight by a railroad operating a continuous line of road in several states and territories from one point in a state to another in the same state, when the course of transportation must be for a considerable distance in another state or territory, is subject to regulations made by the board of railroad commissioners of that state, or whether such traffic is interstate or intrastate. If the former, it is conceded by counsel for the defendants that the railroad commission of the state of Arkansas has no power to regulate the charges for carrying freight, and the demurrer to the bill should be overruled. The language of section 8, art. 1, of the constitution of the United States is that congress shall have power to "regulate commerce with foreign nations, and among the sev-

eral states, and with the Indian tribes." But for this provision of the constitution, each sovereign state would have the right to regulate and tax all commerce coming from the other states, or passing through it. Shipments from one point of a state to another in the same state would, the moment they entered the other state, although intended only for passage through that state, be subject to the control of the authorities of that state. Under the articles of confederation, in force prior to the adoption of the constitution, each of the states claimed and was conceded that privilege. No doubt, to avoid this interference with the foreign commerce, as well as that among the states, was one of the great objects of the framers of the constitution, and one of the important causes giving rise to the calling of the convention which framed the constitution. Mr. Madison, in paper No. 42 of the Federalist, speaking of this subject, said:

"The defect of power in the existing confederacy to regulate the commerce between its several members is in the number of those which have been clearly pointed out by experience. To the proofs and remarks which former papers have brought into view on this subject, it may be added that without this supplemental provision the great and essential power of regulating foreign commerce would have been incomplete and ineffectual. A very material object of this power was the relief of the states, which import and export through other states, from the improper contributions levied on them by the latter. Were these at liberty to regulate the trade between state and state, it must be foreseen that ways would be found out to load the articles of import and export, during the passage through their jurisdiction, with duties which would fall on the makers of the latter and the consumers of the former. We may be assured by past experience that such a practice would be introduced by future contrivances, and, both by that and a common knowledge of human affairs, that it would nourish unceasing animosities, and not improbably terminate in serious interruptions of the public tranquility. To those who do not view the question through the medium of passion or of interest, the desire of the commercial states to collect in any form an indirect revenue from their uncommercial neighbors must appear not less impolitic than it is unfair, since it would stimulate the injured party, by resentment as well as interest, to resort to less convenient channels for their foreign trade; but the mild voice of reason, pleading the cause of an enlarged and permanent interest, is but too often drowned before public bodies, as well as individuals, by the clamors of an impatient avidity for immediate and immoderate gain."

In his Journal of the Constitutional Convention (volume 1, p. 46) Mr. Madison, in speaking of the defects in the articles of confederation, says:

"The same want of a general power over commerce led to an exercise of the power, separately, by the states, which not only proved abortive, but engendered rival, conflicting, and angry relations."

And further on he says, on page 48:

"Such were the defects, the deformities, the diseases, and the ominous prospects for which the convention were to provide a remedy, and which ought never to be overlooked in expounding and appreciating the constitutional charter,—the remedy that was provided."

On page 60, Mr. Madison, in enumerating the deficiencies of power under the confederation, said, among other things, that:

"The federal government could not defend itself against encroachment from the states."

It is now well settled that this grant to congress gives it exclusive control of commerce among the states, and absolutely deprives the states of any and all power to legislate in any manner interfering with or impeding interstate commerce. Gibbons v. Ogden, 9 Wheat. 1, 186, 6 L. Ed. 23; Passenger Cases, 7 How. 395, 400, 12 L. Ed. 702; Robbins v. Taxing Dist., 120 U. S. 492, 7 Sup. Ct. 592, 30 L. Ed. 694; Wabash, St. L. & Pac. Ry. Co. v. Illinois, 118 U. S. 573, 7 Sup. Ct. 4, 30 L. Ed. 244; Leisy v. Hardin, 135 U. S. 108, 10 Sup. Ct. 681, 34 L. Ed. 128; Covington & C. Bridge Co. v. Kentucky, 154 U. S. 218, 14 Sup. Ct. 1087, 38 L. Ed. 962; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. And it is equally well settled that the power granted to congress by the constitution does not extend to commerce wholly within a state. Gibbons v. Ogden, supra; Geer v. Connecticut, 161 U. S. 531, 16 Sup. Ct. 600, 40 L. Ed. 793. While in the case at bar the railroad does not traverse a state other than the state of Arkansas, but a territory with no legislative powers, these powers having been reserved by congress to itself, this cannot in any way affect the determination of the issues involved, as it is a jurisdiction separate and distinct from the state of Arkansas, and it can no more be invaded by that state than if it were a sovereign state. Congress alone has the power to regulate the internal affairs of the Indian Territory, prescribe regulations for railroads therein, limit their charges for the transportation of freight and passengers, and exercise the powers which in a state belong to the people of that state. Insurance Co. v. Canter, 1 Pet. 541, 7 L. Ed. 242; U. S. v. Gratiot, 14 Pet. 534, 10 L. Ed. 573; First Nat. Bank v. Yankton Co., 101 U. S. 133, 25 L. Ed. 1046; Late Corp. of Church of Jesus Christ of Latter-Day Saints v. U. S., 136 U. S. 1, 10 Sup. Ct. 792, 34 L. Ed. 481. The right of way through the Indian Territory now enjoyed by complainant was derived from congress, which granted it to complainant's predecessor. In the act granting the right of way, congress exercised the power to regulate and limit the rates of transportation over the soil of the territory. The language used is:

"That said railroad company shall not charge the inhabitants of said territory a greater rate of freight than the rates authorized by the laws of the state of Arkansas for services or transportation of the same kind, provided that passenger rates on said railroad shall not exceed three cents per mile. Congress hereby reserves the right to regulate the charges for freight and passengers on said railroad and messages on said telegraph and telephone lines until a state government shall be authorized to fix and regulate the cost of transportation of persons and freight within its respective limits by said railroad; but congress expressly reserves the right to fix and regulate at all times the cost of such transportation by said railroad or said company whenever such transportation shall extend from one state into another, or shall extend into more than one state: provided, however, that the rates of such transportation of passengers, local or interstate, shall not exceed the rates above expressed; and provided, further, that said railroad company shall carry the mail at such price as congress may by law provide, and until such rate is fixed by law the postmaster general may fix the rate of compensation." 27 Stat. 487; Act Cong. Feb. 27, 1893.

The Indian Territory must, therefore, for the purpose of this suit, be treated as if it were a state, possessing all the powers and attributes of any of the states comprising the Union. The power of

the state to prescribe rates for railroads engaged in domestic commerce is not absolute, but must be exercised with due regard to the rights of the owners, or otherwise the power would be equivalent to that of confiscation of property without due process of law. Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. Mr. Justice Harlan, speaking for the court in that case, says:

"We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public; and, in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth." 169 U. S. 546, 18 Sup. Ct. 434, 42 L. Ed. 849.

The railroad commission of the state, in fixing rates, must consider all of these matters; and if the rate fixed for domestic traffic solely is in disregard of these principles, and if, upon a hearing, it is found that the rates fixed by the commission are so low as to prevent a railroad company from earning an amount at least sufficient to pay to the owners some profit, although it may be but small, it is the duty of the court to prevent the enforcement of such a tariff by the commission. Chicago M. & St. P. R. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 33 L. Ed. 970; Chicago & G. T. Ry. Co. v. Wellman, 143 U. S. 339, 12 Sup. Ct. 400, 36 L. Ed. 176; Reagan v. Trust Co., 154 U. S. 363, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Railway Co. v. Tompkins, 176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417. To determine that question the commission must have the power to investigate all these matters. It would have to take into consideration the laws and regulations, duly enacted by or in behalf of the Indian Territory, which can in any way add to the cost of carrying on the business of a common carrier. It must make allowance for the additional expenses thus incurred by reason of state laws, which, as has been held by the supreme court, the states have the power to impose under the constitution of the United States, even as to trains engaged in interstate business. The state may, if it sees proper, enact laws requiring locomotive engineers to be examined and licensed by a state board, even in the case of an engineer operating a locomotive attached to a train running from a point in that state to points in another state. Smith v. Alabama, 124 U. S. 465, 8 Sup. Ct. 564, 31 L. Ed. 508; Nashville C. & St. L. R. Co. v. Alabama, 128 U. S. 96, 9 Sup. Ct. 28, 32 L. Ed. 352. It may prohibit freight trains from running on the Sabbath, although in effect thereby preventing freight trains carrying interstate freight from running. Hennington v. Georgia, 163 U. S. 299, 16 Sup. Ct. 1086, 41 L. Ed. 166. It may

regulate the speed of railroad trains within the limits of cities, regardless of the fact whether the train is used for interstate commerce or not. Erb v. Morasch, 177 U. S. 584, 20 Sup. Ct. 819, 44 L. Ed. 897. It may regulate and prohibit limitations in bills of lading issued in the state by a railroad company, although the freight is to be transported to other states. Railroad v. McCann, 174 U. S. 580, 19 Sup. Ct. 755, 43 L. Ed. 1093. It may by legislation regulate the heating of passenger cars, although used in interstate transportation. New York, N. H. & H. R. Co. v. New York, 165 U. S. 628, 17 Sup. Ct. 418, 41 L. Ed. 853. It may require a reasonable number of passenger trains to stop at cities of a certain size, although such trains may be engaged in interstate transportation. Lake Shore & M. S. Ry. Co. v. Ohio, 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702; Gladson v. Minnesota, 166 U. S. 427, 17 Sup. Ct. 627, 41 L. Ed. 1064. The lawmaking power of the state may require a brakeman for every freight car; it may prohibit what are called "double headers"; it may limit the hours of labor of the employés of railroad corporations and enact other reasonable regulations (Stone v. Trust Co., 116 U. S. 307, 334, 6 Sup. Ct. 334, 29 L. Ed. 631); and perhaps, in consideration of these additional burdens imposed on the railroads, it may allow a greater charge for the transportation of passengers, as well as freight, through its territory, than neighboring states in which no such burdens are imposed.

But how is the commission of one state to take into consideration these laws and regulations of other states? Yet in the case at bar it is attempted by defendants to regulate charges without such investigation, and they seek to fix the rate of transportation over complainant's road as to shipments which·are carried less than half of the distance in this state, and the rest in the Indian Territory. No state has the power to authorize a commission to fix rates arbitrarily, with no power in the courts to stay the hands of the commission if it chooses to establish rates that are unequal and unreasonable. In Chicago, M. & St. P. R. Co. v. Minnesota, supra, the state had attempted to invest the railroad commission with such a power, and. the supreme court of the state upheld the act; but upon appeal to the federal supreme court that court held:

"This being the construction of the statute by which we are bound in considering the present case, we are of opinion that, so construed, it conflicts with the constitution of the United States in the particulars complained of by the railroad company. It deprives the company of its right to a judicial investigation, by due process of law, under the forms and with the machinery provided by the wisdom of successive ages for the investigation judicially of the truth of a matter in controversy, and substitutes therefor, as an absolute finality, the action of a railroad commission, which, in view of the powers conceded to it by the state court, cannot be regarded as clothed with judicial functions or possessing the machinery of a court of justice."

The rate from a certain point to another is a unit. In Wabash, St. L. & Pac. Ry. Co. v. Illinois, supra, the court say:

"A citizen of New York has goods which he desires to have transported by the railroad companies from that city to the interior of the state of Illinois. A continuous line of rail over which a car loaded with these goods can be carried, and is carried habitually, connects the place of shipment

with the place of delivery.  He undertakes to make a contract with a person, engaged in the carrying business at the end of this route from whence the goods are to start, and he is told by the carrier: 'I am free to make a fair and reasonable contract for this carriage to the line of the state of Illinois; but when the car which carries these goods is to cross the line of that state, pursuing at the same time this continuous track, I am met by a law of Illinois which forbids me to make a free contract concerning this transportation within that state, and subjects me to certain rules by which I am to be governed as to the charges which the same railroad company in Illinois may make, or has made, with reference to other persons and other places of delivery.'  So that, while that carrier might be willing to carry these goods from the city of New York to the city of Peoria at the rate of 15 cents per 100 pounds, he is not permitted to do so because the Illinois railroad company has already charged at the rate of 25 cents per 100 pounds for carriage to Gilman, in Illinois, which is 86 miles shorter than the distance to Peoria.  So, also, in the present case, the owner of corn, the principal product of the country, desiring to transport it from Peoria, in Illinois, to New York, finds a railroad company willing to do this at the rate of 15 cents per 100 pounds for a car load, but is compelled to pay at the rate of 25 cents per 100 pounds, because the railroad company has received from a person residing at Gilman 25 cents per 100 pounds for the transportation of a car load of the same class of freight over the same line of road from Gilman to New York.  This is the result of the statute of Illinois, in its endeavor to prevent unjust discrimination, as construed by the supreme court of that state.  The effect of it is that, whatever may be the rate of transportation per mile charged by the railroad company from Gilman to Shelden, a distance of 23 miles, in which the loading and the unloading of the freight is the largest expense incurred by the railroad company, the same rate per mile must be charged from Peoria to the city of New York. The obvious injustice of such a rule as this, which railroad companies are by heavy penalties compelled to conform to, in regard to commerce among the states, when applied to transportation which includes Illinois in a long line of carriage through several states, shows the value of the constitutional provision which confides the power of regulating interstate commerce to the congress of the United States, whose enlarged view of the interests of all the states, and of the railroads concerned, better fits it to establish just and equitable rules."

Counsel for defendants rely solely upon the decision of the supreme court in Lehigh Val. R. Co. v. Pennsylvania, 145 U. S. 192, 12 Sup. Ct. 806, 36 L. Ed. 672, and the decisions of the supreme courts of the states of Missouri, North Carolina, and Iowa, in Sewell v. Railway Co., 119 Mo. 222, 24 S. W. 1002, State v. W. U. Tel. Co., 113 N. C. 213, 18 S. E. 389, and Campbell v. Railroad Co., 86 Iowa, 587, 53 N. W. 351, 17 L. R. A. 443.  The decisions in the latter cases are based entirely upon what was supposed to have been determined in the Lehigh Valley Case.  As the decision in that case is conclusive on this court on the issues involved and before the court, it is unnecessary to consider any of the other cases.  If everything said by the learned chief justice, in his opinion in that case, is applicable to this cause, the demurrer to this bill must be sustained; but a careful examination of that opinion clearly shows that those parts of the opinion on which defendants rely were not necessary for the determination of the issues involved in that case, and must be considered as obiter dicta.  The question before the court in the Lehigh Valley Case is thus stated by the learned chief justice, who delivered the opinion of the court:

"The receipts named in class 2 are confined to that part of the transportation from Mauch Chunk to Phillipsburg, and the taxation to the mileage

wholly within the state of Pennsylvania; and the question is whether this taxation in respect of such receipts from freight and passengers carried by continuous transportation to Philadelphia from Mauch Chunk by way of Trenton, N. J., amounts to a regulation of interstate commerce." 145 U. S. 200, 12 Sup. Ct. 807, 36 L. Ed. 674.

And in another part of the opinion he says:

"The tax under consideration here was determined in respect of receipts for the proportion of the transportation within the state; but the contention is that this could not be done because the transportation was an entire thing, and in its course passed through another state than that of the origin and destination of the particular freight and passengers." Page 201, 145 U. S., page 808, 12 Sup. Ct., and page 675, 36 L. Ed.

And the learned chief justice calls special attention to the fact that:

"It should be remembered that the question does not arise as to the power of any other state than the state of the termini, nor as to taxation upon the property of the company situated elsewhere than in Pennsylvania, nor as to the regulation by Pennsylvania of the operations of this or any other company elsewhere; but it is simply whether, in the carriage of freight and passengers between two points in one state, the mere passage over the soil of another state renders that business foreign which is domestic." Page 202, 145 U. S., page 808, 12 Sup. Ct., and page 675, 36 L. Ed.

That case must, therefore, be limited as an authority to the questions before the court, and to no others. If this view is correct, it necessarily follows that the case at bar is clearly distinguishable from the Lehigh Valley Case.

In Pacific Coast S. S. Co. v. Board of R. Com'rs, 9 Sawy. 253, 18 Fed. 10, Mr. Justice Field says:

"To bring the transportation within the control of the state as a part of its domestic commerce, the subject transported must be within the entire voyage under the exclusive jurisdiction of the state. If the ships of the plaintiffs carried any persons or merchandise between ports of the state not going out, on their voyage between those ports, of the jurisdiction of the state, and the persons or merchandise carried not coming from any other state or foreign country or going to another state or country, the transportation commencing and ending in the state, then to that extent they would be engaged in commerce purely domestic, and to that extent the railroad commissioners might have jurisdiction to regulate fares and freight for transportation of the vessels." 18 Fed. 13, 9 Sawy. 258.

In Hall v. De Cuir, 95 U. S. 485, 24 L. Ed. 547, the validity of a civil rights statute of the state of Louisiana, so far as it affected passengers traveling on a steamboat on the Mississippi river between ports in that state, was held void as a burden upon interstate commerce. The facts in that case were that a person of color took passage upon a boat plying as a regular packet for the transportation of freight and passengers between New Orleans, in the state of Louisiana, and Vicksburg, in the state of Mississippi, touching at the intermediate landings, both within and without Louisiana, from a point in Louisiana to another in the same state. Being refused accommodations, on account of her color, in the cabin specially set apart for white persons, she instituted an action for damages under the Louisiana law, and the court held:

"There can be no doubt that the exclusive power has been conferred upon congress in respect to the regulation of commerce among the several states. * * * The river Mississippi passes through or along the borders of ten

different states, and its tributaries reach many more. The commerce upon these waters is immense, and its regulation clearly a matter of national concern. If each state was at liberty to regulate the conduct of carriers while within its jurisdiction, the confusion likely to follow could not but be productive of great inconvenience and unnecessary hardship. Each state could provide for its own passengers and regulate the transportation of its own freight, regardless of the interests of others. Nay more; it could prescribe rules by which the carrier must be governed within the state in respect to passengers and property brought from without. On one side of the river or its tributaries he might be required to observe one set of rules, and on the other another. Commerce cannot flourish in the midst of such embarrassments. No carrier of passengers can conduct his business with satisfaction to himself, or comfort to those employing him, if on one side of a state line his passengers, both white and colored, must be permitted to occupy the same cabin, and on the other be kept separate. Uniformity in the regulations by which he is to be governed from one end to the other of his route is a necessity in his business, and to secure it congress, which is untrammeled by state lines, has been invested with the exclusive legislative power of determining what such regulations shall be. If this statute can be enforced against those engaged in interstate commerce, it may be as well as those engaged in foreign; and the master of a ship clearing from New Orleans for Liverpool, having passengers on board, would be compelled to carry all, white and colored, in the same cabin during his passage down the river, or be subject to an action for damages, 'exemplary as well as actual,' by any one who felt himself aggrieved because he had been excluded on account of his color. This power of regulation may be exercised without legislation, as with it. By refraining from action, congress in effect adopts as its own regulations those which the common law (or the civil law, where that prevails) has provided for the government of such business, and those which the states, in the regulation of their domestic concerns, have established affecting commerce, but not regulating it, within the meaning of the constitution. In fact, congressional legislation is only necessary to cure defects in existing laws, as they are discovered, and to adapt such laws to new developments of trade. As was said by Mr. Justice Field, speaking for the court in Welton v. Missouri, 91 U. S. 282, 23 L. Ed. 347, 'inaction [by congress] * * * is equivalent to a declaration that interstate commerce shall remain free and untrammeled.' Applying that principle to the circumstances of this case, congressional inaction left Benson at liberty to adopt such reasonable rules and regulations for the disposition of passengers upon his boat, while pursuing her voyage within Louisiana or without, as seemed to him most for the interest of all concerned. The statute under which this suit is brought, as construed by the state court, seeks to take away from him that power so long as he is within Louisiana; and while recognizing to the fullest extent the principle which sustains a statute, unless its unconstitutionality is clearly established, we think this statute, to the extent that it requires those engaged in the transportation of passengers among the states to carry colored passengers in Louisiana in the same cabin with whites, is unconstitutional and void. If the public good requires such legislation, it must come from congress, and not from the states. We confine our decision to the statute in its effect upon foreign and interstate commerce, expressing no opinion as to its validity in any other respect." 95 U. S. 489-491, 24 L. Ed. 548, 549.

It will be noticed that the court expressly declined to consider the power of congress over commerce on navigable waters, but rested its decision solely on the commerce clause of the constitution. Applying these principles to the case at bar, the contention of the defendants cannot be sustained, for the trains carrying the freight between the points named traverse for the largest part of the voyage territory outside of the state of Arkansas.

The interstate commerce commission had the identical question before it on two occasions, and reached the conclusion that its ju-

risdiction extended over such shipments, to the exclusion of the commissions of the states. New Orleans Cotton Exchange v. Cincinnati, N. O. & T. P. Ry. Co., 2 Inters. Com. R. 375; Milk Producers' Protective Ass'n v. Delaware, L. & W. R. Co., 7 Inters. Com. R. 92, 160. The latter case was determined since the decision in the Lehigh Valley Case, and by the commission distinguished from a case like the one at bar.

In State v. Chicago, St. P., M. & O. Ry. Co., 40 Minn. 267, 41 N. W. 1047, the facts were identical with those of this case, and the court say:

"The order prescribing rates, and to enforce the observance of which is the object of this proceeding, applies to the entire route from Duluth to Mankato, a large part of which—indeed, the greater part of which—lies beyond the boundaries of our state, and within the territory of another sovereignty. These rates are for the continuous carriage of freight over the entire route, including the transit of 148 miles through the state of Wisconsin. The order is as applicable to that part of the line as to that which is within our own state, and can only be sustained upon the theory that the railroad and warehouse commission of the state of Minnesota has authority to determine what charges may be made for the transportation of freight by a common carrier through the state of Wisconsin, provided, only, that the carrier receives this property within the state, and is to carry it through the foreign state to a destination within our own borders. In view of the above decisions of the supreme court of the United States, that the transportation of freight by a common carrier, apart from considerations of contract concerning the property as between the shipper and the consignee, is a subject of 'commerce,' to which the constitution applies, it is not a matter of controlling importance that the consignor and consignee, or place of shipment and destination, be within the same state, if the transportation is through a foreign state. Assuming that the constitution places within the exclusive control of congress the subject of transportation among the several states, let us suppose that a shipment is made from Duluth to Winona—both cities being within our state, but upon the borders of Wisconsin—by a route wholly within the latter state, excepting the inconsiderable distance of the depot grounds in those cities from the state line. Can it be said that this carriage of perhaps 200 miles through the state of Wisconsin, and of a mile or two within our own borders, is domestic transportation and commerce, as distinguished from that which, under the constitution, is to be deemed as being 'among the several states'? The constitution, as interpreted by the court whose decisions upon this subject are final, has placed under the exclusive regulation of congress the subject of transportation among the states, so far, among other things, as relates to the matter of charges, in order that it may be protected from conflicting and adversely discriminating state legislation. See authorities above cited. Is not a case such as we have supposed, or the case now before us, transportation among the states, within this purpose of the constitution, as really as would be a shipment and transportation of goods from New York, Chicago, or Milwaukee to Minnesota, as to which unquestionably, under the decisions above cited, congress, and not the several states, would have the power to regulate? We are unable to state any principle which supports the relator's claim of jurisdiction to determine what charges may be made for the transportation of freight through the state of Wisconsin. Whether the result would have been different if the order had prescribed rates only with respect to so much of the route as is within our own state we do not decide. The mere fact that Duluth and Mankato are both in this state, and that a part of the line of road of this respondent is also here, and operated under our law, cannot authorize our state authorities to regulate the operation of the 148 miles of road which is wholly within the state of Wisconsin, and which there exists and is managed, of course, under the laws of that state, subject to such limitations as the national constitution may impose."

In Gibbons v. Ogden, Chief Justice Marshall, in defining the word "among" in the commerce clause of the constitution, says:

"Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more states than one. The phrase is not one which would probably have been selected to indicate the completely interior traffic of a state, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce to which the power was to be extended would not have been made, had the intention been to extend the power to every description." 9 Wheat. 194, 6 L. Ed. 69.

The test laid down by the chief justice as to what is not commerce among the states is:

"That commerce which is completely internal, which is carried on between man and man in a state or between different parts of the same state, and which does not extend to or affect other states." 9 Wheat. 194, 6 L. Ed. 69.

The court is of the opinion that upon the allegations contained in the bill complainant is entitled to the relief asked, and the demurrer to the bill is overruled.