### In re ARKANSAS RAILROAD RATES.

#### (Circuit Court, E. D. Arkansas, W. D.   April 19, 1909.)

1. INJUNCTION (§ 167*)—PRELIMINARY INJUNCTION—MODIFICATION.
    A preliminary injunction may be modified at any time when the ends of justice require it, either by the trial court or the appellate tribunal.
    [Ed. Note.—For other cases, see Injunction, Dec. Dig. § 167.*]

2. INJUNCTION (§§ 153, 154*)—PRELIMINARY INJUNCTION—TERMS.
    In granting or refusing a preliminary injunction, proper consideration must be given to the comparative injury which will be sustained by the defendant if the injunction is granted, and by complainant if it is refused, and in order to prevent such injury the court in the exercise of its discretion may impose terms and conditions on the parties at whose instance it proposes to act.
    [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 338, 339; Dec. Dig. §§ 153, 154.*]

3. CONSTITUTIONAL LAW (§ 70*)—RATES—REGULATION—INJUNCTION.
    Though the making of carrier's rates is a legislative and not a judicial act, within the jurisdiction of the courts, and courts cannot make rates on a final hearing, a court, for the purpose of requiring complainant, who has obtained a preliminary injunction against alleged confiscatory rates, to do equity, and prevent the imposition of extortionate rates for carriage, may fix maximum rates beyond which complainant shall not go during the pendency of the litigation, and make the compliance with such maximum a condition on which the temporary injunction will be continued.
    [Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 70.*]

4. CARRIERS (§ 18*)—RATES—PRELIMINARY INJUNCTION—EFFECT.
    The effect of a preliminary injunction restraining the enforcement of freight rates prescribed by the Arkansas Railroad Commission and the two-cent passenger rate imposed by Act Ark. Feb. 9, 1907 (Acts 1907, p. 10), was to leave the railroads in the state without any legal limitation so far as the laws of the state were concerned as to the freight rates chargeable, and to permit a return to the three-cent passenger rate in force prior to the act of 1907.
    [Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**5. CARRIERS (§ 12*)—RATES—BRANCH LINES.**

Where large railroad corporations construct extensive branch lines within a state through new and unsettled sections at great expense, principally to serve as feeders for the main line, and also to enable the roads to obtain shorter lines for interstate traffic, such railroads are not entitled to charge rates on intrastate traffic sufficiently high to enable them to earn a specified percentage on their investment in such lines.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 12.*]

**6. CARRIERS (§ 18*)—RATES—INJUNCTION.**

Rates established by the Arkansas Railroad Commission and the two-cent passenger law (Act Ark. Feb. 9, 1907 [Acts 1907, p. 10]) having been enjoined pendente lite as confiscatory, the railroads returned to a three-cent passenger rate and raised freight rates within the state from 50 to 200 per cent., the average raise on a revenue-producing basis being 77 per cent. *Held,* such raise was extortionate, and that the court, as a condition to retaining the injunction, would leave the passenger rate at three cents and require a freight tariff not exceeding 33⅓ per cent. higher than the rates enjoined.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18.*]

On Motion for Modification of Preliminary Injunctions.
See, also, 163 Fed. 141.

John M. Moore, Buzbee & Hicks, Reid & McDonough, and B. R. Davidson, for complainants.

Hal L. Norwood, Atty. Gen., Joseph M. Hill, James H. Harrod, and Wm. F. Kirby, for defendants.

TRIEBER, District Judge. Upon application for a temporary injunction made by the railroads of this state, and heard by Judge Van Devanter, one of the Circuit Judges of this circuit, preliminary injunctions were granted restraining the enforcement of the intrastate rates then prescribed by the Railroad Commission of the state of Arkansas for the transportation of freight and the two cents a mile passenger act of the General Assembly of the state of Arkansas, approved February 9, 1907 (Acts 1907, p. 10), the contention on the part of complainants being that they were unreasonable, noncompensatory, and confiscatory. At that hearing the learned judge found from the evidence submitted that the additional cost of intrastate traffic exceeds that of the interstate of the complaining roads 100 per cent. on freight, and 15 per cent. on passenger traffic, and, applying this rule to the earnings of the roads and their values, decided that "the rates in question are noncompensatory and unreasonable, and that their enforcement, although not so intended, is nothing other than a taking of the property of the railroad companies without due compensation, which is confiscation." The opinion on that hearing will be found in 163 Fed. 141.

The State Railroad Commission now applies for a modification of these temporary injunctions, alleging that "since the granting of the preliminary injunctions the railroad companies have established freight and passenger rates on all intrastate business which are unreasonable and exorbitant and are destroying many of the industries of the state." It is charged that the passenger rate has been raised to three

cents a mile, and the freight tariffs put into effect increased those prescribed by the commission, and in force at the time the temporary injunctions were granted, as follows: Fifty per cent. on grain; on cotton, 140 per cent.; on packing-house products, 100 per cent.; on coal, 35 per cent.; on brick, stone, and sand, 75 per cent.; on lumber, 107 per cent.; and other various lines of merchandise about 75 per cent.—that the average increase on the principal commodities of the state on a revenue producing-basis is over 77 per cent., which rates it is claimed are unreasonable, extortionate, and oppressive to the shippers and consumers of the state. It is therefore asked that the preliminary injunction now in force be modified so as to prevent this injustice.

That a preliminary injunction may be modified at any time whenever the ends of justice require it is beyond question. Not only may it be done by the trial court, but upon appeal by the appellate tribunal. Denver & Rio Grande R. Co. v. United States, 124 Fed. 156, 59 C. C. A. 579. Judge Sanborn, who delivered the opinion of the court in that case, said that:

"A preliminary injunction may be modified when by such modification the injury or inconvenience of one or more of the litigants may be decreased without increasing the danger of loss to their opponents."

And, accordingly, he modified the temporary injunction which had been granted by the lower court. There can be no doubt that a temporary injunction cannot be claimed as an absolute right, but is within the sound discretion of the court; that discretion, of course, to be controlled by the established principles of equity jurisprudence. Shubert v. Woodward (C. C. A.) 167 Fed. 47. In the headnote of that case, prepared by the court, it is said:

"The specific performance of contracts and the issuance of injunctions are not matters of right; they rest not in the arbitrary or whimsical will, but in the judicial discretion of the court, informed and guided by the established principles, rules, and practice in equity, which are advisory rather than mandatory."

See, also, New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820; Kansas v. Colorado, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956.

In granting or refusing a preliminary injunction, proper regard must be had for the comparative injury which will be sustained by the defendant if the injunction were granted, and by complainant if it were refused, and, in order to prevent great injury to the defendant when the complainant is prima facie entitled to a temporary injunction, the court, in the exercise of its discretion, frequently resorts to the expediency of imposing terms and conditions upon the parties at whose instance it proposes to act. Russell v. Farley, 105 U. S. 433, 438, 442, 26 L. Ed. 1060; Meyers v. Block, 120 U. S. 206, 214, 7 Sup. Ct. 529, 30 L. Ed. 644; Ewing v. Filley, 43 Pa. 384, 387; Denver & Rio Grande R. Co. v. United States, 124 Fed. 156, 161, 59 C. C. A. 579; Mountain Copper Co. v. United States, 142 Fed. 625, 73 C. C. A. 621; Vogel v. Warsing, 146 Fed. 449, 77 C. C. A. 199; McElroy v. Kansas City (C. C.) 21 Fed. 257, 264, 263; McCaul v. Braham (C. C.) 16 Fed. 37, 42; Spring Valley Water Co. v. San

Francisco (C. C.) 165 Fed. 667; Macon R. R. Co. v. Gibson, 85 Ga. 1, 11 S. E. 442, 21 Am. St. Rep. 135; Carleton v. Rugg, 149 Mass. 550, 22 N. E. 55, 5 L. R. A. 193, 14 Am. St. Rep. 446; Kerr on Injunction (2d Am. Ed.) 30; Spelling on Injunction, 1031, 1033. The authorities cited by counsel for complainants all refer to permanent, and not preliminary, injunctions, and for this reason are not applicable to this proceeding.

In Denver & Rio Grande R. Co. v. United States, supra, it was said that:

"The purpose of a preliminary injunction is to protect and preserve the rights of all the litigants with the least injury to each until the controversies between them can be tried and finally decided."

In Spring Valley Water Co. v. San Francisco, supra, the question before the court was the terms upon which a preliminary injunction should be granted against the enforcement of an ordinance fixing water rates to be charged by complainant. Judge Farrington, in a very exhaustive and learned opinion, held that:

"This court cannot control the discretion of the supervisors; it cannot substitute its judgment for theirs. The power and duty of fixing water rates is cast by the Constitution on that board, and not on this court. The law nowhere provides an appeal to this court from an ordinance adopted by the board of supervisors, nor does it clothe this tribunal with any authority to review, revise, correct, or send back to that body for reconsideration an ordinance establishing the compensation to be collected for water. * * * It would seem, therefore, that the court is limited to the determination of a single question, namely, is the ordinance confiscatory?"

And coming to the question of a preliminary injunction, the learned judge says:

"It is an abuse of judicial discretion to issue an injunction which will permit one party to obtain any advantage by acting, while the hands of the adverse party are tied by the writ."

From these authorities it may be stated that a court, when called upon to grant a preliminary injunction, may impose such terms, on granting it, as will protect the rights of the defendant as well as those of the complaining party, and if, after the temporary injunction has been granted, and before a final hearing, while it is in force, it is shown to the court that great injustice is being done by reason thereof, that the acts of the plaintiff are unjust, oppressive, and unmindful of the rights of the defendants, the court may modify it by imposing terms which will prevent such injustice.

This leaves for determination another very important matter. Can the court, for the purpose of requiring the complainant, who obtained the preliminary injunction, to do equity and preventing the imposition of extortionate rates for the carriage of freight and passengers, fix maximum rates beyond which complainants must not go during the pendency of the litigation, and make a compliance with these rates a condition upon which the temporary injunction will be continued? That the making of carriers' rates is a legislative act and not judicial is frankly conceded by counsel for the defendants, and for this reason courts are powerless to make them. Upon final hearing the court must, if it is shown that the commission rates are compensatory within

the meaning of the law, dissolve the preliminary injunction or make it perpetual if they are found to be noncompensatory, and therefore confiscatory. The authorities are not only numerous, but harmonious, on this subject. A few of the leading and late cases is all that it is necessary to cite on the subject. Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 400, 14 Sup. Ct. 1047, 1054, 38 L. Ed. 1014; Interstate Commerce Commission v. Ry. Co., 167 U. S. 479, 499, 505, 17 Sup. Ct. 896, 42 L. Ed. 243; Prentiss v. Atlantic Coast Line, 211 U. S. 210, 226, 29 Sup. Ct. 67, 53 L. Ed. ——. But when the application is for a temporary injunction, the rule is different. As was said in Spring Valley Water Co. v. San Francisco, supra:

"While it appears that the ordinance in question is probably confiscatory, and therefore invalid, the fact that complainant will suffer irreparable injury unless an injunction issues is not decisive. The court owes equal consideration to both parties; it must not issue an injunction which will do more harm to one party than good to the other; it should so preserve the matters in dispute as to protect each party as far as possible from harm. We have no means of knowing the plans of the company, whether it will raise the rates for the remainder of the fiscal year to the full amount of what is alleged to be reasonable—that is, so as to realize an income of more than $3,000,000 net—or whether it will be content with something less. If the ordinance is finally adjudged valid, any collections made in excess of the rates specified therein must be repaid. Such repayment can be secured by a proper bond; but if the ordinance is adjudged confiscatory, and therefore invalid, there is no practicable remedy for the consumer, who, under the necessity of agreeing to the terms offered by the company or foregoing the use of water, contracts to pay, and does pay, more than is just. His injury is irreparable. It is not sufficient to say that courts will enjoin the unreasonable charges, or that this court will promptly dissolve the injunction, if, pending the suit, complainant abuses the process of the court. Whether the rates so fixed by the company are reasonable or unreasonable is a question of fact which no court would presume to decide without a hearing, and such a hearing may be long and expensive. Most consumers will consider water of any quality or price cheaper than litigation. Neither conception of the status quo is satisfactory. Neither, if maintained, will afford adequate protection but to one party. If the ordinance is confiscatory, complainant is entitled to an additional sum which will make its compensation just and reasonable. This sum will be lost to complainant if the injunction is denied. On the other hand, if the ordinance is confiscatory and the injunction is granted as prayed for, if complainant exacts a compensation in excess of what is just, the excess will be lost to San Francisco and its inhabitants. Equity, however, has no peculiar concern for the status quo, except that its preservation usually, if not always, accomplishes that which is the object of a preliminary injunction; that object is to preserve the fund, the property, the right or other thing in dispute, from waste, destruction, or disturbance until the rights and equities of the contending parties can be fully considered and determined. Notwithstanding the fact that the ordinance is probably confiscatory, and that its enforcement should be restrained pending suit in order to save complainant from irreparable injury, an interlocutory injunction, the effect of which is to give complainant the authority, practically without limit, to fix prices at which it will sell water, must be denied for the following reasons."

He then proceeds to state the reasons, which it is unnecessary to repeat here.

The effect of the preliminary injunctions is to leave the state without any regulating freight rates—it is otherwise as to the passenger rates, as the statute in force at the time of the enactment of the act of 1907, limiting them to three cents a mile, is undoubtedly effective if the later act is void (St. Louis, etc., Ry. Co. v. State, 86 Ark. 343,

111 S. W. 260)—and leaves the railroads without any limitation, so far as the laws of the state of Arkansas are concerned, to make them what they deem proper until the final determination of these causes. Assuming from the figures presented by the complainants, and as found by Judge Van Devanter, that the rates enjoined are confiscatory, or at least not sufficiently remunerative, the injunction, if the evidence at the final hearing is the same, would have to be made perpetual. In that event the rates collected during the pendency of these actions, no matter how excessive and unreasonable, and until the commission can make new rates, rates sufficient to enable the roads to earn a reasonable compensation, will be wholly lost to the shippers. It is true, the preliminary injunction specially provides that:

"Nothing recited in this order shall operate to prevent the said Railroad Commission of the state of Arkansas from establishing and enforcing any reasonable, compensatory, and lawful rates in place of those whose enforcement is hereby inhibited."

But is it not very probable, nay, almost certain, that any rates which may be proposed by the commission, if less than those rates put in effect by the complainants, which they claim are as low as they can make them, will cause further litigation, as supplementary bills would be filed to enjoin them as confiscatory? Of course, the court could refuse to grant the injunction if the rates were not shown to be confiscatory, but in order to do that the court would necessarily have to determine what rates were compensatory and just, and, in all likelihood, from evidence identical with that submitted at this hearing. As the Railroad Commission contends, and no doubt every member thereof believes, that the rates now enjoined were compensatory, or, if not that, a very slight increase would make them so, the probabilities are that a number of suits would have to be filed by each of the railroads until a tariff would be prepared which would justify the court, acting upon the basis of apportionment of expense made in this case, and which will not be disturbed before there is a final hearing, if then, to refuse a preliminary injunction. In the meantime the rates, although they may be unjust and oppressive, would be collected.

Therefore, not only to prevent a multiplicity of suits, but to require complainants who seek equity do equity, this court is justified in prescribing such maximum rates as may be just to the railroads as well as the public. In Spring Valley Water Co. v. San Francisco, supra, Judge Farrington found that complainant would probably be entitled to a gross income of $266,675.60 in excess of that afforded by the rates fixed by the supervisors, and thereupon he held that complainant was entitled to so much relief, but no more, and granted the preliminary injunction upon that condition.

It is true that in the San Francisco Water Company Case there were only a few rates to be fixed, while in these cases hundreds of different rates must be determined. This may necessitate a great deal more labor, and may require the assistance of a special master if the parties are unable to reach an agreement under the directions and instructions of the court, if the court finds that the rates put in force by the railroad companies since the granting of the preliminary injunctions are so ex-

orbitant as to be unjust and oppressive. But this ought not to prevent the court from doing justice and preventing a wrong. The difference is only one of degree, and not of principle. If it appears from the evidence that the rates now in force are unreasonable, enabling complainants to increase their earnings on intrastate rates to a much greater extent than is necessary to enable them to make a reasonable return on their investment, great damage will necessarily be sustained by the public, who pay these rates, for some of which there can be no redress, even if the injunction should be dissolved. For the court to refuse to act in such a case would be an injustice which no court of equity should ever be guilty of. The bond executed by the railroad companies and the provisions made by the orders granting the preliminary injunctions, providing for an ascertainment of the damages, will only become effective if, upon final hearing, the injunctions are dissolved; but if it should appear upon that hearing that the rates, while compensatory to some extent, are still not sufficient to enable complainants to earn as much as in the opinion of the court they are lawfully entitled to, the injunction would have to be made perpetual, although a small increase of the rates from 5 to 10 per cent. would be sufficient to have made the rates compensatory within the meaning of the law. In such a case no recovery could be had by the defendants, even if it should appear that the increase in the rates during the pendency of the temporary injunction exceeded 100 per cent. And even if the injunction should upon final hearing be dissolved, the only damages which the law would permit to be recovered would be the difference between the rates paid under the increased tariff schedules and what would have been paid under the rates enjoined. In the meantime industries may have been prostrated and wholesale houses driven from the state because, owing to the high rates in force during the pendency of these proceedings, they are unable to maintain their trade in competition with others located outside of the state and enjoying the benefits of lower interstate rates.

At the hearing of this application a great deal of testimony was introduced tending to show not only the extent of the increase of rates since the preliminary injunctions have been granted, but it was also shown that interstate rates from points outside of this state, on business competitive with that of the business men of this state, have not been increased. It appears from these affidavits that some branches of business have been practically suspended so far as intrastate business is concerned, by reason of the fact that the lower rates given to competitors doing business in other states prevented them from being able to deliver to retail dealers in parts of this state their articles of manufacture at the same prices. It is true the railroads claim, and no doubt justly, that although the new intrastate rates have been in force for over five months, and no changes in interstate tariffs have yet been made, they will soon put them in effect, and they will be as high as those now in force on intrastate business; they claim that the changing of these tariffs requires a great deal of time; that the last few months have been the busiest of the year; and that under the interstate commerce law, before new interstate rates can become effective, they must be filed with the Interstate Commerce Commission 30 days.

The court has no doubt that these statements are true, and that these complainants do not intend to discriminate against the people of this state whose welfare is necessary to their own existence; still the injury has been, and is still, being inflicted. While these facts would not be sufficient to justify this court in declaring the rates exorbitant and unjust, they are circumstances which should be taken into consideration, not so much for the purpose of determining whether their present tariff is exorbitant, as for the purpose of determining the propriety of the court, sitting as a court of equity, to exercise its power to prevent injustice to and oppression of the people of the state, if the proofs show that is being done.

This hearing was had on ex parte affidavits, testimony which can never be said to be conducive to obtaining exact facts; still, as the most important testimony is based upon documentary evidence, the tariffs in force at the different times, and the income and expenditures of the roads, it is comparatively easy to ascertain the effect of these new rates.

On the part of the Railroad Commission comparative statements of the freight rates in force when the bill was filed and those put in since the granting of the preliminary injunctions, and which are conceded to be correct, were introduced. These indicate that some rates have been raised over 200 per cent., and the average increase in the freight rates on a revenue basis, it is claimed, exceeds 77 per cent. On the other hand, it is claimed by the railroad companies that some of the rates of the commission were absurdly low, and that the increase of the new rates, as shown by the earnings for the month of November, 1908, the first month the new rates went into effect (for one of the roads it is based on the earnings for the months of November and December, 1908), the increase is as follows:

St. L., I. M. & S. Ry. Co. ............................................41.80%
St. L. & S. W. Ry. Co. ..............................................41.59%
C., R. I. & P. Ry. Co. ..............................................24.95%
St. L. & S. F. Ry. Co. ..............................................17.77%
K. C. Southern Ry. ..................................................38.31%

—or an average of the five roads of 36.75 per cent. These calculations are based on the actual sums collected, compared with what would have been collected upon the basis of the rates enjoined. No doubt this is the most satisfactory, if not the only correct, basis for ascertaining on a revenue basis the actual increase of the rates, especially as these actions are based solely upon the ground that the commission rates were so low as not to earn anything on the investment of complainants. But can it be said that the business of one or even two months, especially the first, after the new increased rates went into effect, is a proper criterion for the ascertainment of these facts? It is urged that during the winter months the rates which were raised the highest, fruit and vegetables, on which the average raise is from 100 to 200 per cent., grapes nearly 300 per cent., seeds from 150 to 200 per cent., lumber, the largest tonnage commodity of the state, over 100 per cent., do not move extensively during the months of November or December; and, in addition thereto, it is claimed, and so shown by the affidavits of a large number of merchants, that immediately after notice had been given of the new rates, and for the

several weeks before they went into effect, a great many merchants purchased all their goods on which the increase of rates was material, and had them shipped to their places of business, so as to obtain the benefit of the lower rates. These statements seem reasonable and fair; but, in any event, it is hardly reasonable, in view of the large variety of products of this state, to take the business of any one or two months as a proper standard for the year's business. This is fully shown by the fact that the revenue increase on a percentage basis of the different roads varies greatly; while the St. Louis, Iron Mountain & Southern Railway Company and the St. Louis Southwestern Railway Company report an increase of nearly 42 per cent., the St. Louis & San Francisco Railway Company shows an increase of only 17.77 per cent., and the Rock Island Railway an increase of less than 25 per cent. No doubt the fact that the industries, as well as the products, mineral, forest, and agricultural, along the line of the latter roads are different from those of the other roads, accounts for this difference. The fact that 40 per cent. of the entire tonnage of the intrastate business of the state is that of lumber and forest materials, for which the tariff has been raised over 100 per cent., is of itself sufficient to show that the business for the months of November and December would hardly be proper tests for the business of the railroads of the state for the year, for there are hardly any months during the year in which there is less building material used than during those months. In addition to this, it must not be overlooked that the rates are not raised horizontally, but run from 3 per cent. to over 200 per cent. Defendants have submitted some calculations based on a large number of freight bills paid during the five months the new rates have been in force. These show an average increase on a revenue basis of over 77 per cent. But they cannot be accepted as a proper test for several reasons. It has been shown that these bills constitute but a little over 1 per cent. of the freight earnings during that time, and there is nothing to show that these bills cover those rates which have been but slightly raised, say from 3 per cent. to 20 per cent., as well as those which were increased greatly. The probabilities are that shippers would pay but little attention to small increases, and furnish only such bills as indicated what they considered excessive rates. Taking the two tariff sheets, those in force at the time the injunction was granted, and those now in operation, with the percentages of increases as figured out by the experts of complainants, and admitted by defendants to be correct, it is reasonable to say that the increase will exceed on a revenue basis considerably over 50 per cent.

On behalf of complainants it is also claimed that these large increases are based on the commission rates, which were much lower than the rates in force before the commission was created, and the tariff then in force is offered in evidence to show that the present rates are but slightly, if any, in excess of those then in force. The tariff sheet offered is that of the St. Louis, Iron Mountain & Southern Railway Company, 1508–A, but it is shown that that tariff was only nominally in effect; that the real tariff was No. 3315, called the "Jobber's Tariff," on which most of the freight traffic was carried,

and, in addition to this, there were special rates for almost every commodity in the state, and that only a few small shippers who were ignorant of tariff schedules were charged rates under 1508–A; that the commission's tariff was but slightly lower than tariff No. 3315, and higher than many of the special tariffs in force at that time.

As to the special tariffs, the court is satisfied from the evidence that they were made very low, in many instances below the cost of carriage, for the purpose of aiding in the establishment of new industries along the lines of railroads, and by these means build up the country, and thus, indirectly, increase the business and earnings of the roads. Such rates, which were not illegal at the time, cannot be considered as a fair test for the purpose of determining what would be compensatory rates. That the commission did make material reductions, even from the "Jobber's Tariff," No. 3315, has been fully established, but it is doubtful whether they amounted to as much as 20 per cent., although the commission, in its first report, claimed credit for having made reductions exceeding 30 per cent. But in considering this claim of the commission, the court is satisfied that in making it they were influenced by the fact that many of the large shippers who had theretofore enjoyed special rates, and which were lost by the acts of the commission, which prohibited discriminations, had attacked the acts of the commission, and were urging the repeal of the statute creating it. A 20 per cent. reduction is a liberal estimate for the tariff of the commission.

On the part of the defendants it is also urged that these rates had been in force for eight years without any complaint on the part of the railroads, or any effort to restrain them, and for this reason it is claimed a strong presumption arises that they were not only not confiscatory, but were just and fair. It is true that, in the absence of any proof, such acts of the railroads would raise a strong presumption that the rates were compensatory, a presumption as strong as the rates made by legislative authority are fair and reasonable; still it is only a presumption, and may be rebutted. For that purpose it has been shown that the commission rates were only submitted to under vigorous and continuous protests, and after it had been fully established by fair trial that these rates were confiscatory did the railroad companies feel justified in invoking the aid of the courts to prevent what they consider a great injustice to them. In addition to that, it has been shown that since then there has been a continual increase in the operating expenses of the railroads in this state. The taxes have been more than doubled since the commission first established its tariff; the cost of materials, necessary for the operation of the trains and maintenance of the tracks, has increased largely; wages of all employés have been raised very materially; the legislation of the state, while no doubt prompted by the best motives, for the purpose of protecting the lives and property of its citizens, has greatly increased the operating expenses of all railroads in this state. The fellow-servant rule of the common law has been abolished; railroads are made liable for all losses sustained by fires caused by sparks from locomotives, regardless of any question of diligence or negligence; the hours of labor of some of their employés have been shortened by statute; additional brake-

men are required for freight trains; every locomotive is required to be provided with powerful electric headlights; many new stations have been established; in some of the cities, through which the roads run, they have been required to erect viaducts over some of the streets to prevent injury to persons using these streets; heavy penalties have been prescribed to secure prompt payments of wages of employés; and many other matters deemed necessary for the protection of property and the lives and comfort of the public are now prescribed by statute which were not required eight years ago. All of these add very much to the financial burdens of these companies. These facts must, of course, be taken into consideration for the purpose of determining what rates are compensatory. As stated by this court in Kansas City Southern Railway Co. v. Board of Railroad Commissioners (C. C.) 106 Fed. 353, 358, affirmed in Hanley v. Kansas City S. R. Co., 187 U. S. 617, 23 Sup. Ct. 214, 47 L. Ed. 333, in speaking of such additional expenses necessarily incurred by reason of the enactment of such laws by the different states:

"And perhaps in consideration of these additional burdens imposed on the railroads, it (the state) may allow a greater charge for the transportation of passengers as well as freight through its territory than neighboring states in which no such burdens are imposed."

That the large increase in their business caused by the development of the natural resources of the state, as well as the rapid growth of its population, the use of improved machinery and rolling stock, the improved condition of the roadbeds after they are used for a number of years, enable the companies to carry freight, as well as passengers, at a lower rate than formerly, cannot be doubted, but the proofs now before the court would hardly justify a finding that there has not been some increase in the cost of the operation of trains in this state within the last few years, since the commission rates went into effect, increases which were gradual but continuous.

Giving due weight to these facts, the next inquiry to be made is, what rates would enable them to earn reasonable returns on their investments? So far as the passenger rates are concerned, it is, of course, easy to ascertain the increase, as the rate was raised from two cents to three cents a mile, an increase of 50 per cent.; but it is claimed that in view of the reduced rates received from the sale of mileage books, and the reductions usually offered the public as excursion rates, when it is sought to attract large crowds for certain occasions, usually of a public nature, and reduced rates furnished to ministers of the gospel, the actual increase in the gross receipts on passenger rates is only about 35 per cent.

A three cent a mile rate, in view of the fact that, comparatively speaking, this state is but sparsely settled, and that there are no large cities in it, is not so unreasonable that the court would feel justified, upon the showing made by the roads, indicating a considerable loss on its intrastate passenger traffic while the two cents a mile rate was in force, to disturb it while these proceedings are pending. Besides, it is well settled that for the purpose of determining whether rates are confiscatory or not all sources of revenue must be considered. Minneapolis & St. Louis R. R. Co. v. Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46

L. Ed. 1151; Seaboard Air Line Co. v. Florida, 203 U. S. 261, 27 Sup. Ct. 109, 51 L. Ed. 175; Atlantic Coast Line R. R. Co. v. North Carolina Corporation Commission, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933.

The increased earnings from one class of traffic will, therefore, justify a corresponding decrease in another class, if the net earnings from all sources are compensatory. For this reason, if the net earnings on passenger traffic are larger, that fact would be considered in determining whether the freight tariffs fixed by the complainants are too high, and also aid in determining what they should be. It is true that lower passenger rates are felt more generally, and for this reason are more fully appreciated by the large majority of the public than lower freight rates, which are not felt so readily by the consumer, the same as the collection of direct and indirect taxes. But so far as the interests of the public at large are concerned, it is of much more importance to them to enjoy the benefit of lower freight rates than passenger rates, provided the latter are not excessive or unreasonable. High freight tariffs not only directly affect the prices of commodities to the consumer, but may seriously cripple, if not totally destroy, manufacturing industries and the business of wholesale dealers, if higher than those charged from competitive points outside of the state, as it is the price at the place of delivery which will control the trade. As the injunction against the enforcement of the two cents a mile passenger rate as confiscatory, and therefore violative of the provisions of the national Constitution, leaves the three cents a mile statute (section 6611, Kirby's Digest of the Statutes of Arkansas) in full force, and this rate has been put in operation by the railroads since the granting of the temporary injunction, this change, therefore, adds to the net earnings of the complainants at least 35 per cent. without any corresponding increase of expenditures. Whether the railroad companies should not be charged with a 50 per cent. increase in these rates, in view of the fact that the reduction below three cents a mile is voluntary on their part, and not in pursuance of any act of the Legislature or the commission, need not be determined at this time, although, in view of the decisions of the Supreme Court, it is very doubtful whether the railroads, if they exercise this power, can be heard to complain if by reason thereof their earnings are not compensatory. In Lake Shore, etc., R. R. Co. v. Smith, 173 U. S. 684, 696, 19 Sup. Ct. 565, 43 L. Ed. 858, it was held that the state had not the power to enact such legislation without violating the national Constitution, and in Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. ——, it was expressly held that, if the company sees proper to make reductions in special cases when not required to do so by law, the decrease by reason of such reduction cannot be considered by the courts in determining the reasonableness of the rates fixed by law. The court there said:

"The company, it is true, might, if it chooses, allow such a discount (a discount of 5 per cent. for prompt payments) from the ordinance rates; but the ordinance required no discount from the rate established by it, and the company, therefore, was bound to offer none. If it stood upon the letter of the ordinance, as it had the right to do, and exacted from the consumers the full charge prescribed by the ordinance, the amount which would have been realized would have been over $4,000 more than that found by the master."

But as this case is not now before the court for final determination, and in view of the fact that the public is the beneficiary of these reduced special rates, they being general and uniform, and the further fact that in this motion to modify the injunction the court is asked to require a reduction of passenger rates, we will not, at this time, determine that question, but, for the purpose of ascertaining the earnings of complainants, only charge them with an increase of 35 per cent.

As to what constitutes a reasonable rate must depend upon the facts of each case, and cannot be determined without reference to the interests of the public. Covington & Lexington Turnpike Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Reagan v. Farmers' Loan & Trust Co., supra; San Diego Land Co. v. National City, 174 U. S. 739, 755, 19 Sup. Ct. 804, 43 L. Ed. 1154; Chicago & Northwestern R. R. Co. v. Dey (C. C.) 35 Fed. 866, 878, 1 L. R. A. 744.

In Covington, etc., Turnpike Co. v. Sandford, the court said:

"It cannot be said that a corporation is entitled of right, and without reference to the interests of the public, to realize a given per cent. upon its capital stock."

This was quoted with approval in Smyth v. Ames, and the court there added:

"It cannot, therefore, be admitted that a railroad corporation maintaining a highway under authority of the state may fix its rates with a view solely to its own interests and ignore the rights of the public. But the rights of the public would be ignored if rates of transportation of persons or property on a railroad are exacted without reference to the fair value of the property used for the public or the fair value of the services rendered, but in order simply that the corporation may meet operating expenses, pay interest on its obligations, and declare a dividend to its stockholders."

Another matter which is entitled to consideration is the fact which has been brought out at this hearing, that the St. Louis, Iron Mountain & Southern Railway Company and the Chicago, Rock Island & Pacific Railway Company have, within the last few years, and since the establishment of the commission rates, constructed extensive branch lines through new and unsettled sections of the state; that these lines were constructed at great expense, owing to the fact that the greater part of these branches runs through swampy country, some of it subject to overflows, which necessitated high embankments; that these roads were built principally to serve as feeders for the main line, and at the same time enable these roads to obtain shorter lines for that part of its interstate traffic which merely passed through the state. These are matters which must be taken into consideration in determining what would be proper net earnings on the investments. It would hardly be proper for the courts to say that such roads are entitled to as great a compensation on their investments from intrastate business as the ordinary roads built for the accommodation of the intrastate as well as the interstate business. As is well known, some of the Pacific roads traverse the desert for hundreds of miles through a strip of territory where there is practically no intrastate business, either freight or passenger. Would it be proper, in such cases, to

hold that the road should have the right to charge for its intrastate traffic in that section tariff rates high enough to enable it to earn a certain, fixed percentage on its investment? Would not, in such a case, the rates have to be so high as to be confiscatory of the property of the residents of that state? Must the public guarantee the railroads a certain income on their investment, regardless of the condition of the country traversed, or whether bad judgment was exercised in the selection of the route? We do not think so. New lines or branches to increase the business of the main line, or the exercise of bad judgment in the building of a railroad, are matters to be considered in determining what rates would be fair and just to the corporation as well as the public. That the railroads are entitled to reasonable profits on their investments, and the public to reasonable rates, or, to express it differently, that the rights of the public and railroad companies are reciprocal, is the correct rule of law.

In Reagan v. Farmers' Loan & Trust Co., supra, Mr. Justice Brewer, speaking for the court, in the concluding part of the opinion said:

"It is unnecessary to decide, and we do not wish to be understood as laying down as an absolute rule, that in every case a failure to produce some profit to those who have invested their money in the building of a road is conclusive that the tariff is unjust and unreasonable. And yet justice demands that every one should receive some compensation for the use of his money or property, if it be possible without prejudice to the rights of others. There may be circumstances which would justify such a tariff; there may have been extravagance and a needless expenditure of money; there may be waste in the management of the road; enormous salaries; unjust discrimination as between individual shippers, resulting in general loss. The construction may have been at a time when material and labor were at the highest price, so that the actual cost far exceeds the present value. The road may have been unwisely built, in localities where there is not sufficient business to sustain a road. Doubtless, too, there are many other matters affecting the rights of the community in which the road is built, as well as the rights of those who have built the road." 154 U. S. 412, 14 Sup. Ct. 1059, 38 L. Ed. 1014.

In San Diego, etc., Co. v. Jasper, 189 U. S. 439, 446, 23 Sup. Ct. 571, 574, 47 L. Ed. 892, it was held:

"If a plant is built, as probably this was, for a larger area than it finds itself able to supply, or apart from that, if it does not, as yet, have the customers contemplated, neither justice nor the Constitution requires that, say, two-thirds of the contemplated number should pay a full return."

Nor is it required that the particular rate of compensation must in all cases and in all parts of the country be the same. Wilcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. ——.

Guided by these principles, the court is of the opinion that rates which will enable the complainants to earn 6 per cent. on their investment, if fairly entitled thereto by prevailing conditions, would be reasonable, especially in view of the fact that a large part of the money used in the construction of these roads was obtained from loans secured by mortgage, and these loans only bear from 4 to 5 per cent. interest per annum, thus leaving a larger return for the stockholder, who, of course, is unsecured, and in case of insolvency of the company would be postponed until the mortgage bondholders are paid in full. For these reasons, the risk of the investment of the stockholder being greater than that of the bondholders, he is entitled to a

higher rate of interest on his investment. In determining what rates would be just and reasonable, the court is relieved of passing upon conflicting evidence for the purpose of determining the value of the investment. Complainants in their bills only ask for compensatory rates on the value of the roads as determined by the State Board of Railroad Assessors, for the purpose of taxation. The assessments in this state are conceded to be upon the basis of 50 per cent. of the actual value of the property, and they therefore ask to be permitted to earn fair dividends on double the amount their roads are assessed for taxes. (This does not apply to the branch line of the Rock Island Road lately constructed, and which is assessed at a nominal value.) For the purpose of determining how much of that amount should be taken into consideration for the intrastate traffic, calculations were made by expert accountants under the direction of Judge Van Devanter, and their calculations, adopted by him for the purpose of passing upon the motions for preliminary injunctions, are here adopted.

While the revenues of the roads, and especially the increased earnings since the new rates, pending this litigation, have been put into effect, vary somewhat, it is impossible to make different rates for each road. The fact that in most of the larger cities of the state two or more of the roads compete for business, and therefore must carry freight at the same rates, would prevent making different rates, and the tariffs prepared by the roads themselves are practically uniform.

The values of the roads for the intrastate traffic, as ascertained by the accountants and adopted by Judge Van Devanter, are as follows:

St. L., I. M. & S. Ry. Co....................................$12,880,982 44
St. L. & S. W. Ry. Co.......................................   4,774,880 82
C., R. I. & P. Ry. Co.......................................   5,200,422 39
St. L. & S. F. Ry. Co.......................................   3,519,791 41

The earnings of these roads for the last six months of the year 1907, calculated on a revenue basis, allowing for the greater cost of intrastate business 100 per cent. on freight, and 15 per cent. on passenger traffic more than for interstate business, as determined by Judge Van Devanter in these cases, are as follows:

| Name of Road. | Gross Frt. Erngs. | Frt. Exp. | Gross Pass. Ergs. | Pass. Expenses. | Net Loss. |
|---|---|---|---|---|---|
| St. L., I. M. & S. Ry Co.... | $640,248.17 | $800,041.29 | $836,542.20 | $865,423.66 | $188,674.58 |
| St. L. & S. W. Ry. Co...... | 348,337.58 | 368,697.43 | 440,452.64 | 463,412.01 | 43,319.22 |
| C., R. I. & P. Ry. Co...... | 210,813.57 | 372,913.48 | 253,395.52 | 220,750.00 | 129,454.39 |
| St. L. & S. F. Ry. Co...... | 139,002.89 | 218,917.65 | 187,173.87 | 176,493.67 | 69,234.57 |

NOTE.—The returns of the St. L. & S. F. Ry. Co. were only for four months, and in order to make them uniform with the others this table shows the earnings and expenditures for six months. Fifty per cent. has been added and is included in the above. The returns of the St. Louis & Southwestern Railway Company include the earnings for the entire year ending June 30, 1908.

In addition to these earnings, each of the roads also showed the receipt of considerable sums from what is called "Miscellaneous Earnings," which are not included in the above tables. These earnings come principally from mail and express, but there is nothing in the evidence to show whether these items caused a net profit or not, as the auditors testified that it is impossible to divide them between intra and inter state business. These earnings were as follows, and constitute the percentages of the entire business of the roads as shown by the figures on the following table:

Miscellaneous Earnings.

| Name of Road. | Gross Frt. Erngs. | Percentage. | Gross Pass. Ergs. | Percentage. | Tot. Gross Earnings. |
|---|---|---|---|---|---|
| St. L., I. M. & S. Ry. Co....... | $122,814.41 | 2.51% | $373,785.47 | 21.01% | $496,599.88 |
| C., R. I. & P. Ry. Co....... | 19,033.43 | 1.48% | 78,940.50 | 11.29% | 97,940.50 |
| St. L. & S. W. Ry. Co....... | 46,228.88 | 1.43% | 154,285.75 | 17.14% | 200,514.63 |

NOTE.—The St. L. & S. F. Ry. Co. did not include this item in its statement, but it would probably average the same proportion to the entire business as that of the other roads.

For the purpose of these proceedings the court is of the opinion that an increase of 33⅓ per cent. on the tariff of freight rates in force at the time these injunctions were granted, the increase to be calculated upon a revenue basis, will enable complainants to earn a reasonable compensation when added to the increased passenger rates, and at the same time prevent the exaction of unjust and unreasonable rates from the public. Calculating the increase of revenue upon that basis, the net earnings for a year, assuming that the business will be the same as it has been, will be as follows:

| Road. | Incrs. in Frt. Earnings. | Incrs. in Pass. Earnings. | Total. | Net Income. |
|---|---|---|---|---|
| St. L., I. M. & S. Ry. Co. | $426,833.12 | $585,579.40 | $1,012,412.52 | $635,063.36 |
| St. L. & S. W. Ry. Co... | 116,112.53 | 154,158.42 | 270.270.95 | 276,951.73 |
| C., R. I. & P. Ry. Co.... | 140,542.38 | 177,376.85 | 317,919.23 | 59,010.45 |
| St. L. & S. F. Ry. Co.... | 92,668.59 | 131,021.45 | 223,690.04 | 85,220.90 |

The net income will allow the companies a profit on their respective investments as follows:

St. L., I. M. & S. Ry. Co.............................................over 5%
St. L. & S. W. Ry. Co................................................ " 4.8%
C., R. I. & P. Ry. Co...............................a little less than 1½%
St. L. & S. F. Ry. Co...........................................about 2½%

These figures indicate that some of the roads would earn but a very small dividend on their investment so far as the intrastate traffic is concerned, but it is impossible, for the reasons hereinbefore stated, to provide the same earnings for roads whose conditions differ so widely as these do. The St. Louis, Iron Mountain & Southern Railway Company, which does the largest proportionate intrastate business, will earn over 5 per cent. on its investment. In view of the fact that it has built two very extensive branches lately through a country having but few inhabitants and no industries, a line intended primarily for its through interstate business, so as to enable it to have a short line from the West to the Gulf of Mexico, this is a very reasonable and fair compensation. The St. Louis & Southwestern Railway Company, which does the next largest proportionate intrastate business, will earn nearly 5 per cent. on the basis of its earnings for the year ending June 30, 1908, which included the first six months of the year 1908, when confessedly traffic was the smallest. Lumber, which is its largest tonnage, was practically not moving at all during that time. At the final hearing the evidence will no doubt show what should be considered as earnings for ordinary times. The St. Louis & San Francisco Railway Company, although it has a large mileage in the state, does but a comparatively small intrastate business as shown by its statement hereinbefore set out, its gross earnings on both passenger and freight traffic being only about 9 per cent. of its valuation. The earnings of the Chicago, Rock Island & Pacific Railway Company seem to be the smallest in proportion to its investment, but a new branch line of 147 miles is included at a valuation of $3,000,000, although assessed at less than $300,000, by reason of the fact that it was but recently built through a swampy section of the state, has been but a short time in operation, and was intended principally for its through interstate business. A computation of the earnings of each of the roads from its intrastate business, as compared with its valuation, as shown by their statements, will show practically the same differences:

| Road. | Net Loss for Year. | Percentage of Loss on Capital Invstd. in Intrastate Traffic. |
|---|---|---|
| St. L., I. M. & S. Ry. Co........... | $377,439.16 | About 2.9% |
| St. L. & S. W. Ry. Co............. | 43,319.22 | "     .9% |
| C., R. I. & P. Ry. Co.............. | 258,908.78 | "    5% |
| St. L. & S. F. Ry. Co............. | 138,469.14 | "    3.9% |

As the country traversed by these new roads is being rapidly settled, and new industries and manufacturing plants are springing up along these lines, the intrastate business will, in all likelihood, increase rapidly. In any event, unless different rates should be made for each road according to its location, cost of building, judgment in selection of the line, it is impossible to fix any rates which will enable each of the roads to earn the same dividends. The tariffs which they have put

in effect are the same for all of the roads, and, for the reasons hereinbefore stated, it would be impracticable to do otherwise.

As these suits will necessarily require considerable time before the final decrees can be rendered, either party may at any time apply to the court for a modification of this order if, after a fair trial, it is found that the rates are unjust to either party. The Railroad Commission, the court is informed, has prepared a freight tariff which, in its opinion, would increase the net revenue of these roads from freight traffic 33⅓ per cent. Copies of these schedules should be furnished immediately to the complainants, and the court has no doubt that if these tariff sheets are found to be inaccurate, and will not produce such an increase in revenue, the parties can agree among themselves to make such changes as will bring about that result. Should they be unable to do so, the court will refer the matter to a special master for the purpose of preparing such tariff rates.

A decree modifying the injunction now in force, in conformity with the views herein expressed, may be prepared by the parties and submitted to the court.